FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PUERTO RICO, demandante y recurrente, *v.* JOSÉ R. NOGUERA, SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y recurrido.

*Número:* 214          *Resuelto:* 20 de septiembre de 1962

*Brown, Newson & Córdova,* abogados de la recurrente; *J. B. Fernández Badillo, Procurador General,* y *Genoveva R. de Carrera, Procurador General Auxiliar,* abogados del recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

El Secretario de Hacienda notificó a la asociación de ahorro y préstamos denominada "First Federal Savings and Loan Association of Puerto Rico", aquí recurrente, una imposición de tasación y contribución sobre propiedad mueble. La recurrente no estuvo conforme con la contribución impuéstale, basándose en que su propiedad está exenta de la misma a tenor con la sección 5(h) de la Ley Federal de Préstamos a Dueños de Hogares (*Home Owners' Loan Act of 1933*), 48 Stat. 128, 12 U.S.C.A. sec. 1464(h), y recurrió al Tribunal Superior. Éste sostuvo la validez de la contribución.

Debido a lo que más adelante veremos que se alega, es conveniente que aclaremos al comienzo que en este caso no está en controversia la facultad del Congreso de los Estados Unidos para eximir de contribuciones a los organismos del Gobierno Federal. Es sabido que el Congreso tiene el poder de determinar, dentro de las limitaciones constitucionales,

hasta qué grado sus agencias han de estar exentas de contribuciones. *Federal Land Bank* v. *Kiowa County*, 368 U. S. 146, 149 (1961); *Carson* v. *Roane-Anderson Co.*, 342 U. S. 232 (1952); *Cleveland* v. *United States*, 323 U. S. 329 (1945); *Maricopa County* v. *Valley National Bank*, 318 U. S. 357 (1943); *Federal Land Bank of St. Paul* v. *Bismarck Lumber Co.*, 314 U. S. 95 (1941); *Pittman* v. *Home Owners' Loan Corp.*, 308 U. S. 21 (1939); *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466 (1939); *Des Moines National Bank* v. *Fairweather*, 263 U. S. 103 (1923); *First National Bank* v. *Adams*, 258 U.S. 362 (1922); *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664 (1899). ■

La controversia gira sobre el punto de si la mencionada sección 5(h) de la citada ley del Congreso exime o no de las contribuciones impuestas o que se impongan por el Estado Libre Asociado de Puerto Rico a las asociaciones de ahorro y préstamos incorporadas o que se incorporen bajo la citada ley. Veamos, pues, enseguida el texto del estatuto. En lo pertinente, dicha sección 5(h) lee como sigue:

"[N]ingún estado, territorio, condado, municipio o autoridad impositiva local impondrá alguna contribución a dichas asociaciones o sobre su franquicia, capital, reservas, excedente, préstamos o ingresos *que sea mayor* que la que tal autoridad imponga a otras instituciones locales similares, mutualistas o cooperativas, de ahorro y préstamos para hogares." 12 U.S.C.A. sec. 1464(h). (Subrayado nuestro.) (¹)

La posición de la peticionaria ante nos es tripartita. Nos presenta los siguientes tres argumentos: (1) Que

(¹) El texto oficial inglés de esa sección lee así: "[N]o State, Territorial, county, municipal, or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income *greater than that imposed by such authority on other similar local* mutual or cooperative thrift and home financing institutions." (Subrayado nuestro.) 12 U.S.C.A. sec. 1464(h).

Por disponerlo así expresamente, esta ley es aplicable a Puerto Rico. 48 Stat. 134 (1933); 12 U.S.C.A. 1466.

ella (la recurrente) es una instrumentalidad o agencia del Gobierno Federal y que por lo tanto está exenta de contribuciones estatales; (2) Que la facultad que confiere la citada sección 5 (h) a los estados y a otras autoridades locales para imponer contribuciones a las asociaciones federales de ahorro y préstamos (como lo es la recurrente) no opera en Puerto Rico porque aquí no existe ninguna institución local similar a la recurrente; y (3) Que la facultad ya mencionada que confiere la sección 5 (h) no opera en Puerto Rico porque aquí existe una institución local similar a la recurrente, verbigracia, la Asociación de Empleados del Gobierno de Puerto Rico, la cual está exenta de contribuciones.

De manera que en su primer argumento sostiene la recurrente que *no hay* facultad impositiva por parte del Estado en este caso. En el segundo argumento reconoce que *hay* dicha facultad impositiva pero expresa que no opera porque en Puerto Rico *no existe* una institución local similar a ella. En su tercer argumento también acepta que hay la facultad impositiva pero alega que no opera porque en Puerto Rico *existe* una institución local similar a ella, la cual está exenta de contribuciones. "Allegans contraria non est audiendus" decían los romanos, pero sigamos adelante, en vista de la Regla 6.5 de las de Procedimiento Civil.

1. En cuanto al argumento número 1 antes mencionado la realidad es que existe la facultad impositiva de parte del Estado Libre Asociado. La lectura del estatuto nos convence de ello. Al aprobar la ley en esos términos el Congreso autorizó expresamente a los estados y a las demás autoridades impositivas locales a imponerle contribuciones a esas asociaciones federales de ahorro y préstamos siempre y cuando que dichas contribuciones no sean más onerosas que las que le impongan a instituciones similares locales, esto es, a las incorporadas bajo las leyes estatales. Así mismo lo reconoce y explica un conocido autor en el campo de las

asociaciones de ahorro y préstamos, Russell, *Savings and Loan Associations*, M. Bender & Co., N.Y.2d ed., 1960, pp. 570–571.(²) ▮

La jurisprudencia ha sostenido uniformemente esa interpretación que hemos expuesto. Se han sostenido judicialmente diversas clases de contribuciones estatales y locales impuestas a las asociaciones federales de ahorro y préstamos. Es conveniente aclarar que dentro del contexto de la ley del Congreso que aquí discutimos y del de esta opinión, y de la jurisprudencia que citaremos, cuando se dice asociación "federal" de ahorro y préstamos lo que la palabra "federal" significa es que esas asociaciones están incorporadas bajo la mencionada ley federal y no bajo una ley estatal. No significa que esas instituciones sean propiedad del Gobierno Federal, ni que sus directores y empleados estén en la nómina de dicho gobierno. A la inversa, cuando la jurisprudencia habla de asociaciones estatales de ahorro y préstamos se refiere a asociaciones incorporadas bajo leyes estatales.

Ejemplos de esa jurisprudencia a que hemos aludido en el párrafo anterior y que está acorde con lo que estamos resolviendo son los siguientes casos: Contribuciones sobre capital, *State* v. *MacCorkle*, 123 S.E.2d 888 (1962); sobre propiedad, *Charleston Federal Savings and Loan Association* v. *Anderson*, 30 S.E.2d 513 (1944), confirmado en 324 U. S. 182, 89 L. ed. 857 (1945); *Charleston Fed. Sav. & Loan Ass'n* v. *James*, 200 S. E. 845 (1939); e *In re Hancock County Fed. Sav. & Loan Ass'n*, 25 S.E.2d 543 (1943);

---

(²) "Congress, however, has granted the state the right to tax such institutions provided it is done uniformly at the same rate that similar state institutions are taxed. . . . Stated positively, the meaning (of section 5-h) would be that any state may impose any such tax on federal associations, provided any such tax is not greater than the tax or taxes imposed on similar state institutions. In the absence of a specific exemption, the provision appears to authorize almost any form of non-discriminatory tax . . . Not being federally owned, federal savings associations are naturally subject to such state taxes." *Russell*, obra citada.

sobre ingresos, *State* v. *Minnesota Fed. Sav. & Loan Ass'n*, 15 N.W.2d 568 (1944); sobre la franquicia (*franchise*), *First Fed. Sav. & Loan Ass'n* v. *Johnson*, 122 P.2d 84 (1942); sobre seguro de empleo, *Texas Unemployment Compensation Commission* v. *Metropolitan Building*, 139 S.W.2d 309 (1940). ■

Las asociaciones de ahorro y préstamos aunque no son técnicamente bancos tienen varios propósitos y procedimientos parecidos a los de los bancos. En algunos aspectos la diferencia entre esas asociaciones y los bancos es real y en otros aspectos es más bien cuestión de terminología. Dichas asociaciones no admiten "depósitos" pero las personas pueden confiarles sus ahorros. Los depositantes no son "acreedores" sino que son "accionistas" o "miembros". Aunque las asociaciones pueden exigir aviso previo de los accionistas para el retiro de los fondos, la práctica general es que éstos pueden retirarlos cuando desean, igual que si se tratase de una cuenta corriente. *Porter* v. *Aetna Casualty Co.*, 370 U. S. 159, 161 (1962). Los accionistas no reciben "intereses" sino "dividendos". Las asociaciones no emiten "cheques del gerente" pero sí giros (*"money orders"*).

La ley que autoriza la organización e incorporación de las asociaciones federales de ahorro y préstamos expresa que esas asociaciones se podrán organizar para proveer instituciones locales de ahorro y para proporcionar financiamiento para hogares. 12 U.S.C.A. sec. 1464(a). Algunos tribunales han expresado que esas asociaciones son instrumentalidades del Gobierno Federal. Parece que lo asumen debido a que dichas asociaciones se incorporan bajo una ley del Congreso.(3) Por el contrario, otros tribunales han sostenido que esas instituciones no son instrumentalidades o

---

(3) *U. S.* v. *Harper*, 241 F.2d 103, 105 (1957); *People of State of California* v. *Coast Fed. Sav. & Loan Ass'n*, 98 F. Supp. 311, 316 (1951); *State* v. *Minnesota Fed. Sav. & Loan Ass'n*, 15 N.W.2d 568, 573 (1944).

agencias de dicho gobierno. (⁴)    En *Texas Unemployment Compensation Commission etc.* citado en el escolio 4 de esta opinión se planteó el problema y se analizó el mismo detenidamente y con realismo.    El tribunal concluyó que dichas asociaciones no son instrumentalidades del gobierno federal.

Esta segunda alternativa nos parece más convincente por las siguientes razones:

(a)  La propia ley que autoriza la creación e incorporación de esas asociaciones de ahorro y préstamos en ninguna parte las declara agencias o instrumentalidades del Gobierno Federal.

(b)  Por el mero hecho de que se incorporen bajo una ley federal y de que están bajo la supervisión de un organismo federal (la "Federal Home Loan Bank Board") no se convierten automáticamente en instrumentalidades del Gobierno de los Estados Unidos, así como no son instrumentalidades del gobierno estatal los bancos comerciales que se incorporan bajo la ley estatal de bancos y que operan bajo la supervisión del Secretario de Hacienda.

(c)  Esas asociaciones no son creadas mediante ley del Congreso.    Lo que la ley federal hace es permitir su organización e incorporación, de igual manera que las leyes estatales de bancos y de corporaciones privadas no crean los bancos ni las corporaciones privadas, sino que permiten su organización e incorporación y disponen para su reglamentación por parte del Estado por razones de orden público.

(d)  Esas asociaciones no son propiedad del Gobierno Federal, ni sus funcionarios y empleados son funcionarios o empleados de dicho gobierno.

(e)  Un indicio fuerte de que el Congreso mismo no las consideró instrumentalidades del gobierno consiste en el

---

(⁴) *Texas Unemployment Compensation Commission* v. *Metropolitan Bldg. & Loan Ass'n.,* 139 S.W.2d 309, 312-314 (1940) ; *First Federal Sav. & Loan Ass'n* v. *Johnson,* 122 P.2d 84, 86 (1942) ; *Capitol Bldg. & Loan Ass'n* v. *Kansas Commission of Labor,* 83 P.2d 106 (1938) ; *North Carolina Unemployment Commission* v. *Wachovia Bank & T. Co.,* 2 S.E.2d 592 (1939).

hecho de que en su propia ley (sec. 5) expresamente autorizó a los estados a imponerle contribuciones, con la limitación antes mencionada y que más adelante explicamos. Por el contrario, cuando el Congreso ha creado bancos federales les ha concedido la inmunidad de contribuciones estatales de manera expresa. *Federal Land Bank* v. *Bismarck Lumber Co.*, 314 U. S. 95, 86 L. ed. 65 (1941); *Anotación* en 86 L. ed. 72. ■

(f) Dichas instituciones son organizadas voluntariamente por ciudadanos privados, operan con fines de lucro y compiten con las asociaciones de ahorro y préstamos estatales. Por ejemplo, en su *Memoria Anual* correspondiente al año 1961 la recurrente informa a sus miembros como sigue:

"Una vez más se ha registrado un aumento considerable en los ingresos y utilidades de la asociación en comparación con los años anteriores. El ingreso bruto alcanzó la cifra de $4,657,762.69 y sobrepasa por la suma de $801,928.69 al correspondiente al año anterior que, hasta aquella fecha, había sido el más alto de nuestra historia y que equivale a un aumento de 20.8 porciento."—Página 9.

"Durante el año de 1961 la asociación pagó a sus imponentes dividendos por la suma de $2,162,684.30, que constituye un aumento de $299,713.96 respecto del año anterior, incremento progresivo que se ha mantenido a través de los trece años de nuestra existencia no sólo respecto de la cuantía de dividendos pagados si que también del tipo de interés de los mismos.

"Como es de vuestro conocimiento, nuestra asociación constituye una cooperativa en que los imponentes son los beneficiarios de las utilidades que obtiene la asociación, utilidades que se destinan íntegramente al pago de dividendos una vez deducidos los gastos de funcionamiento y administración y la cantidad que por disposición reglamentaria debe destinarse a reservas."—Pág. 12.

"Con esta nueva adquisición (el edificio de la Sucursal de Barrio Obrero en San Juan) la asociación viene a ser propietaria de los edificios que ocupan tres de sus cuatro sucursales, a saber: Avenida Muñoz Rivera en Río Piedras; Calle De Diego en Río Piedras y Barrio Obrero. El valor depreciado de estos

edificios incluyendo el local de nuestra oficina matriz monta a $2,334,446.14. Su valor real en el mercado puede estimarse muy conservadoramente en exceso de $3,000,000.

, "La construcción de nuestro nuevo edificio nos confrontó con la necesidad de tomar una determinación respecto del antiguo edificio en la Avenida Ponce de León esquina Alianza, decidiéndose que convenía al mejor interés de la asociación enajenar el mismo y así se hizo poco después de haber quedado vacante, vendiéndolo con una pequeña utilidad."—Pág. 13.

Ante esa realidad resulta difícil creer que se trata de una "instrumentalidad o agencia del Gobierno Federal".

Es cierto que la ley dispone que esas asociaciones serán miembros del Banco Federal de Préstamos Sobre Hogares (Federal Home Loan Bank) y que pueden ser utilizadas por el Gobierno Federal como agentes fiscales suyos (podrían prestarle servicios tales como recibir pagos a nombre del gobierno, ser depositarios de fondos federales, etc.) pero sólo cuando el Secretario del Tesoro de los Estados Unidos así las designe. 12 U.S.C.A. sec. 1464(f) y (k). Sin embargo, esto de por sí solo no las convierte en instrumentalidades del gobierno. El hecho de que la ley le dé la facultad al Secretario del Tesoro a designar a cualquiera de esas asociaciones como agente fiscal del gobierno no las convierte a todas *ipso facto* (hay millares en los Estados Unidos) [5] en agencias o instrumentalidades del gobierno.

Como se señala en *Texas Unemployment Commission* v. *Metropolitan, Etc.*, supra, págs. 312 y 313, los tribunales han resuelto que los bancos estatales que se hacen miembros del "Federal Home Loan Bank" o del "Federal Reserve System" y que en virtud de ello se les requiere actuar como agentes fiscales del Gobierno Federal no se convierten por ese hecho en instrumentalidades federales. Además, los servicios que prestan al Gobierno Federal las asociaciones federales de ahorro y préstamos, cuando se les requiere, son iguales a los que prestan a ese mismo gobierno, cuando se les requiere, las

---

[5] *Russell*, obra citada, pág. 145.

asociaciones estatales de ahorro y préstamos que se hacen miembros del "Federal Home Loan Bank" y dichas asociaciones estatales no han sido consideradas como instrumentalidades del Gobierno Federal. ■

Tal vez tendría importancia, a los fines de decidir este caso, dilucidar si la recurrente es o no una instrumentalidad federal, si el Congreso hubiese guardado silencio en cuanto a lo que a la imposición de contribuciones estatales se refiere, pero el Congreso decidió la cuestión al autorizar expresamente la imposición de dichas contribuciones en la sección 5(h) de la ley. Por eso no es necesario que resolvamos dicha cuestión ya que el resultado de este litigio sería el mismo en uno u otro caso. Considérese a la recurrente instrumentalidad federal o no, la contribución estatal procede en virtud de la citada sección 5(h). *State* v. *Minnesota Fed. Sav. & Loan Ass'n*, supra; *People of State of California* v. *Coast Federal Savings & Loan Ass'n*, 98 F. Supp. 311, 319 (1951). Hemos considerado conveniente, sin embargo, discutir para aclarar el punto levantado al respecto por la recurrente.

También concebimos que en determinadas circunstancias y en el descargo de sus deberes como agente del Gobierno Federal, así expresamente designada por el Secretario del Tesoro, una de esas asociaciones, o varias, según sea el caso, sea considerada o deba ser considerada para determinados fines como una instrumentalidad de dicho gobierno. Pero ciertamente ese no sería el caso en cuanto a contribuciones estatales pues como hemos visto la propia ley federal las autoriza.

2. El segundo planteamiento de la recurrente consiste en la alegación de que la contribución no procede porque no existen en Puerto Rico instituciones locales similares a ella. El argumento es erróneo por tres razones. Primero, sostener esa posición equivaldría a añadirle a la ley federal una condición que el Congreso no incluyó en la misma. Segundo,

en estricta lógica el argumento es falaz, ya que el Estado no le está imponiendo a la recurrente ninguna contribución que sea mayor que la que le está imponiendo a instituciones locales similares pues, como señala la recurrente, éstas no existen. Recordamos que uno de los grandes maestros explica que el derecho no se compone de lógica,(6) pero, añadimos nosotros, tampoco de falacias. ■

Tercero, tal alegación desatiende completamente el propósito de la condición o limitación que el Congreso prescribió en la citada sección 5(h). Al Congreso disponer que las contribuciones que los estados impusiesen a las asociaciones federales de ahorro y préstamos no podrían ser más onerosas que las que impusiesen a instituciones locales similares, lo que el Congreso se propuso hacer fue proteger a las asociaciones federales de posibles discrímenes contributivos por parte de los estados contra dichas asociaciones federales y a favor de las asociaciones estatales. Su propósito no fue concederle exención contributiva. *Laurens Federal Savings & Loan Ass'n* v. *South Carolina Tax Comm.,* 365 U. S. 517, 5 L.ed. 2d 749, 752 (1961); *State* v. *Minnesota Federal Savings & Loan Ass'n,* supra, a la pág. 573; *First Federal Savings & Loan Ass'n* v. *Johnson,* supra, a la página 88; Russell, obra citada, p. 571.(7) ■

La intención del Congreso de proteger a las asociaciones federales de discrímenes por parte de los estados, encaminados a favorecer a las asociaciones estatales, no surge caprichosamente. Está fundada en la experiencia y en la historia que rodea desde principios de la república las relaciones entre los estados y los organismos bancarios incorporados por o bajo legislación federal. En ocasiones anteriores los estados

---

(6) Holmes, *Common Law,* ed. 1946, p. 1.

(7) "The purpose (of section 5-h) was to protect federal associations from discriminatory taxation which would put them on any less favorable basis than state building and loan associations." *State* v. *Minnesota Fed. Sav. Etc.,* supra, p. 573.

habían tomado medidas de represalia y de discrimen contra entidades bancarias incorporadas en virtud de legislación del Congreso.

Se recordará que el primer Banco de los Estados Unidos fue incorporado mediante ley del Congreso en el año 1791, gracias mayormente al esfuerzo del Secretario del Tesoro, el antillano Alejandro Hamilton y a pesar de la oposición del Secretario de Estado Tomás Jefferson, del Congresista Jaime Madison, y del Procurador General Edmundo Randolph. [8] La controversia sobre los bancos nacionales se mantuvo viva, aunque a veces sumergida bajo otras cuestiones de más actualidad, hasta la Guerra Civil. Cuando la franquicia de 20 años del Banco de los Estados Unidos estaba próxima a expirar los bancos estatales tomaron el liderato en contra de que el Congreso le concediese una nueva franquicia al mismo. Los opositores del banco nacional tuvieron éxito y dicho banco se vio obligado a cerrar sus puertas al cesar su franquicia en 1811.

Una muestra de cual era el sentimiento para esa época sobre el particular es la resolución aprobada por la Asamblea Legislativa de Pennsylvania "instruyendo" a los senadores y a los representantes de ese estado en el Congreso de los Estados Unidos de hacer "todo lo que estuviese a su alcance para evitar que la franquicia del Banco de los Estados Unidos fuese prorrogada o que el Congreso incorporase cualquier otro banco con el propósito de que operase dentro de la jurisdicción de cualquier estado, sin obtener antes el consentimiento de la Asamblea Legislativa del estado. [9] Protagonistas de la controversia fueron, entre otros, John Calhoun, Daniel Webster, John Randolph, Madison y Henry Clay, algunos de los cuales, como Webster y Clay variaron completamente su posición al pasar de los años.

---

[8] 1 Stat. 191 (1791), Swisher, *American Constitutional Development*, 2d. ed., 1954, p. 72.

[9] *American State Papers*, VIII, Finance, II, 467, citado en Swisher, *American Constitutional Development*, 2d. ed., 1954, p. 171.

Mayormente debido a las necesidades surgidas con motivo de la guerra con Gran Bretaña volvieron a dominar en el Congreso los favorecedores del banco nacional y aprobaron una nueva ley incorporando el segundo Banco de los Estados Unidos en el 1815, la cual Madison, ahora Presidente, vedó pero firmó la del 1816.([10])   El resentimiento por parte de los estados fue tal que muchos aprobaron medidas hostiles al nuevo Banco de los Estados Unidos.   Por ejemplo, Indiana dispuso en su constitución que quedaba prohibido que allí operasen bancos que no hubiesen sido incorporados en dicho estado.   En Illinois, también mediante disposición constitucional, se prohibieron los bancos que no fuesen bancos estatales.   En Tennessee la Asamblea Legislativa legisló imponiendo altos derechos anuales a los bancos no estatales por el privilegio de hacer negocios en dicho estado.   Represalias económicas similares tomaron las asambleas legislativas de Kentucky, Ohio, Georgia y Maryland.   El propósito de estas medidas era hacerle imposible al nuevo Banco de los Estados Unidos funcionar en esos estados y frustrar así la intención del Congreso.([11])

Al mencionar al estado de Maryland en conexión con esa controversia política y económica recordamos enseguida el famoso caso de Mc Culloch v. Maryland decidido en 1819,([12]) el cual surgió precisamente de la misma.   Marshall en su opinión, al exponer la teoría de los poderes implícitos del Gobierno Federal, utilizó en gran medida los argumentos que había expuesto Hamilton siendo Secretario del Tesoro en el 1791 en su opinión escrita al Presidente recomendándole que firmase la ley del primer Banco de los Estados Unidos. En aquella ocasión el Presidente, ante la importancia del

---

([10]) 3 Stat. 266 (1816).

([11]) Beveridge, *Life of John Marshall*, (4 Vols., 1916–1919), IV, 206–208; Charles Warren, *The Supreme Court in United States History* (rev. ed., 2 Vols., 1926), I, 505–506; *Swisher*, obra citada, págs. 173–174.

([12]) 4 Wheaton 316.   Para interesantes comentarios sobre este caso puede verse *Beveridge*, obra citada, IV, Capítulo 6; *Warren*, obra citada, I, capítulo 12; *Swisher*, obra citada, p. 174–178.

asunto y ante la controversia que el mismo había originado, solicitó las opiniones de su Procurador General Randolph, de su Secretario de Estado Jefferson y del Tesorero Hamilton.([13]) Como se sabe, en ese caso se trataba de un organismo que era una criatura del Congreso, cuyos propósitos eran eminentemente gubernamentales y que era una instrumentalidad del Gobierno Federal. La decisión fue muy controversial y provocó abundantes y fuertes expresiones a favor y en contra entre los periódicos, abogados y políticos de la época.([14])

La controversia sobre el Banco continuó latente y volvió a estallar cuando se acercó el fin de la franquicia, también de 20 años, del segundo Banco de los Estados Unidos. Desde el año 1829 Andrew Jackson era el Presidente y si salía electo por segunda vez a su administración le correspondería decidir si se prorrogaba o no la franquicia del Banco. Cuando los favorecedores del Banco llegaron al convencimiento de que Jackson no favorecía la prórroga estos empezaron a hacer campaña contra Jackson y a favor de su adversario Henry Clay. El Banco mismo se involucró en la campaña política en forma activa y a veces impropia.([15]) Jackson salió electo para un nuevo término y lo contrario le sucedió al Banco, el cual pasó a la historia al expirar su franquicia en 1836.

No es necesario continuar el trasfondo histórico. Para terminar baste con decir que en esa controversia política había envueltos serios problemas de banca y moneda y que los mismos volvieron a hacer crisis durante la Guerra Civil. Se creó entonces un sistema nacional de bancos distinto al concepto que informaba los dos experimentos anteriores.([16])

([13]) *The Works of Alexander Hamilton*, ed. D. C. Hamilton, 7 Vols. 1850–1851, IV, 104–138; *Swisher*, obra citada, pp. 72–74 y 176–177.

([14]) *Warren*, obra citada, I, 511–540; *Beveridge*, obra citada, IV, 309.

([15]) *Swisher*, obra citada, pp. 180–185.

([16]) Davis, *The Origin of the National Banking System*, Senate Doc. 582, 61st Cong., 2d sess., 1910; 12 Stat. 665.

Dicho sistema funcionó hasta el año 1913 en que fue suplantado por el actual sistema ("Federal Reserve System") establecido durante la administración del Presidente Wilson.

Naturalmente no estamos expresando criterio sobre la histórica controversia. Además, el caso de las asociaciones federales de ahorro y préstamos es distinto; éstas son producto de otra época, de otra legislación fundada en diferentes premisas, y no son bancos nacionales, sino, como hemos visto, son instituciones de diferente naturaleza. Sin embargo, como al autorizarse su incorporación bajo ley federal en 1933 ya existían en los distintos estados las asociaciones estatales y ante el posible y tal vez probable discrimen estatal el Congreso creyó necesario incluir en la ley la protección ya discutida. ■

3. El tercer y último planteamiento de la recurrente se basa, contrario a lo alegado en el segundo, en que en Puerto Rico existe una asociación similar al "First Federal Savings & Loan Association", que ésta es la Asociación de Empleados del Gobierno de Puerto Rico, la cual está exenta de contribuciones y que por lo tanto la recurrente también lo está a tenor con lo dispuesto en la sección 5(h) antes citada. Esta alegación es poco menos que frívola. La Asociación de Empleados del Gobierno de Puerto Rico (17) es "una institución *pública* de carácter *compulsorio* para todos los empleados y funcionarios públicos" del Gobierno de Puerto Rico "siendo sus fines estimular el ahorro entre sus asociados y asegurarlos contra inutilidad física o muerte, efectuar préstamos, proveerlos de hogares y clínica para el tratamiento médico de ellos y sus familiares y cualquier otra actividad que previo estudio se considere beneficiosa y adecuada por la Junta de Directores a las finalidades que se persiguen, con sujeción a las leyes que rigen a dicha asociación y propender por todos los medios y recursos a su alcance al mejo-

---

(17) Ese es su nuevo nombre. 3 L.P.R.A. sec. 831, Supl. 1961.

ramiento y progreso individual y colectivo de los elementos que la integran en el orden económico, moral y físicamente, a cuyo objeto por la presente se confieren las facultades y poderes necesarios a su organismo director para reglamentar y tomar los acuerdos y adoptar las resoluciones indispensables para ello, incluyendo la fijación y cobro de cuotas uniformes por conceptos de servicios médicos." (Subrayado nuestro.) 3 L.P.R.A. sec. 831.

La ley que crea dicha Asociación de Empleados ordena el descuento de una cuota mensual de los sueldos de los empleados y funcionarios públicos, cuyas sumas son separadas por el Secretario de Hacienda para constituir el Fondo de Ahorro y Préstamo. Dicha institución se gobierna por una Junta de Directores en la cual, por mandato de la ley, cada una de las tres ramas del gobierno, la Legislativa, la Ejecutiva y la Judicial tienen representantes. La ley además tiene disposiciones específicas sobre solicitud y aprobación de préstamos, seguros por muerte e inutilidad física, descuento en período de vacaciones, nombramiento de su Secretario-Contador y demás personal, etc. 3 L.P.R.A., secs. 831–861. Resulta claro la gran diferencia entre estas dos instituciones. Cf. *State* v. *Minnesota Fed. Sav. & Loan Ass'n.*, supra, en que se sostuvo también para fines contributivos la diferencia mucho menos evidente entre las asociaciones federales de ahorro y préstamo y unas cooperativas de ahorro organizadas bajo la ley estatal de Minnesota.

Concluímos que la recurrente no está exenta del pago de contribución sobre la propiedad y, por tanto, el tribunal de instancia no erró al así sostenerlo. *Se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en este caso, el 28 de agosto de 1959.*