ASOCIACIÓN DE EMPLEADOS DEL E.L.A., demandante y recurrido, *v.* BERNABÉ VÁZQUEZ PÉREZ, demandado y peticionario.

*Número:* CE-87-376 *Resuelto:* 5 de mayo de 1992

408

410

*Diógenes Alayón Quiñones, Héctor A. Cortés Babilonia* y *Francisco J. Jorge Negrón*, abogados del peticionario; *Blanca A. Sardina Cardona* y *Brunilda Alvarado Colón*, abogadas del recurrido.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

Nos corresponde resolver en el presente caso si la Asociación de Empleados del Estado Libre Asociado de Puerto Rico (en adelante Asociación), en lo concerniente a la otorgación de préstamos, debe cumplir con las disposiciones de la ley federal conocida popularmente como *Truth in Lending Act* (en adelante T.I.L.A.), 15 U.S.C. sec. 1601 y ss.

# I

*Hechos*

El Sr. Bernabé Vázquez Pérez trabajaba para la Administración de Corrección del Estado Libre Asociado de Puerto Rico. El 1ro de marzo de 1977 gestionó un préstamo en la Asociación por la cantidad de mil seiscientos cincuenta dólares ($1,650), el cual le fue otorgado. A tales efectos, se le descontó mensualmente de su salario la cantidad de cincuenta y ocho dólares con treinta y cuatro centavos ($58.34), a partir del segundo mes de la fecha de expedición del pagaré.

El señor Vázquez Pérez cumplió satisfactoriamente con su obligación hasta el 14 de septiembre de 1977, fecha en que cesó en su empleo. Al liquidarse su cuenta, quedó un balance pendiente de pago de cuatrocientos trece dólares con setenta y seis centavos ($413.76). Dicha cantidad continuó devengando intereses "por el tipo de interés permitido por ley",[1] según pactado por las partes en el pagaré suscrito por el señor Vázquez Pérez. De manera que, además del principal, el señor Vázquez Pérez adeudaba ciento setenta y tres dólares con cuarenta y cinco centavos ($173.45), por concepto de intereses computados hasta diciembre de 1983. Es decir, adeudaba un total de quinientos ochenta y siete dólares con veintiún centavos ($587.21).

Ante tal situación, la Asociación envió varias cartas al señor Vázquez Pérez exigiéndole el pago de lo adeudado. Al no recibir respuesta por parte del señor Vázquez Pérez, la Asociación instó demanda civil en el Tribunal de Distrito, Sala de San Sebastián, al amparo de la entonces vigente

---

[1] Ni en el pagaré ni en la hoja de notificación de préstamo se indica específicamente cuánto es el por ciento de interés anual que se cobra por la Asociación de Empleados del Estado Libre Asociado de Puerto Rico (en adelante Asociación). Sencillamente se indica en el pagaré mediante la frase "por el tipo de interés permitido por ley" que se cobrarán intereses.

Regla 60 de Procedimiento Civil,[2] 32 L.P.R.A. Ap. III, el 23 de diciembre de 1983. En otras palabras, se acogió al procedimiento sumario.

Así las cosas, mediante moción presentada el 1ro de febrero de 1984, la cual fue acogida por el tribunal, se convirtió el pleito en uno ordinario. En la contestación a la demanda se planteó como defensa afirmativa por el señor Vázquez Pérez que la Asociación incurrió en violaciones al T.I.L.A., "ya que la hoja de notificación (disclosure statement) es inadecuada e insuficiente según las disposiciones de dicha Ley". Alegó que en dicha hoja de notificación no se estableció claramente cuánto era la tasa de por ciento anual y los cargos por financiamiento. Además, no se cumplió con la ley al no resaltar o destacar los datos antes mencionados del resto de la información que aparece en la hoja de notificación de préstamo.

Luego de transcurrido el descubrimiento de prueba, la Asociación presentó una moción de sentencia sumaria, la cual fue acogida por el tribunal de instancia dictándose sentencia sumaria a favor de la demandante el 14 de mayo de 1986. No conforme con esta determinación, el demandado presentó moción de reconsideración. Esta fue denegada el 30 de junio de 1986.

---

[2] *"REGLA 60. RECLAMACIONES DE QUINIENTOS DOLARES O MENOS*

"Cuando se presentare un pleito en cobro de una suma que no exceda de quinientos (500) dólares exclusive de los intereses, el secretario inmediatamente notificará al demandado por correo, telégrafo o cualquier otro medio de comunicación por escrito.

"Si el demandado residiere fuera de Puerto Rico se hará su citación por edicto de acuerdo a la Regla 4.5.

"La notificación especificará la naturaleza de la reclamación y la fecha señalada para la vista. Dicha vista se celebrará en la fecha más próxima posible, pero nunca antes de cinco (5) días de la notificación al demandado. El demandado deberá presentar todas las defensas en la vista. El tribunal entenderá en todas las cuestiones litigiosas en el acto de la vista y dictará sentencia inmediatamente. Si el demandado no compareciere, el tribunal, al determinar que fue debidamente notificado y que se le debe alguna suma al demandante, dictará sentencia. Si se demostrare al tribunal que el demandado tiene alguna reclamación sustancial, o en el interés de la justicia, el tribunal podrá ordenar que el pleito se continúe tramitando bajo el procedimiento prescrito por estas reglas." 32 L.P.R.A. Ap. III.

De dicha sentencia el demandado apeló al Tribunal Superior, Sala de Aguadilla, planteando fundamentalmente que erró el Tribunal de Distrito al concluir que "la ley Federal de Veracidad en los préstamos, conocida como Truth in Lending Act, (15 U.S.C.A. sec. 1601) y el Reglamento Z, (12 C.F.R. 226), no son de aplicación al presente pleito basándose en que la parte demandante, Asociación de Empleados del E.L.A. '... no es una Organización con fines de lucro', y 'no otorga préstamos al público en general...' ".

El Tribunal Superior declaró sin lugar la apelación interpuesta y confirmó la sentencia dictada por el Tribunal de Distrito. Acogió los fundamentos expresados por el Tribunal de Distrito al citar en la sentencia que:

La Truth in Lending Act, obliga a las instituciones bancarias y firmas financieras a informar ampliamente al consumidor que tiene la necesidad de crédito, el costo de dicho crédito. El cargo por financiamiento debe ser expresado en dólares y el porciento anual computado a base del balance deudor. Debe además, informarse los términos del contrato a los fines de que el consumidor pueda comparar con lo que le ofrecen otras instituciones bancarias y escoger lo más beneficioso conforme a su necesidad de crédito.

La competencia entre las instituciones financieras y bancos para atraer clientes, ofrece diversidad de servicios y facilidades. Por lo tanto, el consumidor para comparar, tiene que ser informado de dichos servicios y facilidades de crédito. Para implantar esta Ley existen unos Reglamentos e interpretaciones de la Junta de Gobernadores de la Reserva Federal relacionados con el Truth in Lending Act. *Estos no aplican a la Asociación de Empleados del Estado Libre Asociado de Puerto Rico.*

Como ya señalamos, esta institución sólo concede préstamos a sus socios, que son los empleados públicos del gobierno estatal. No compite con ninguna otra institución bancaria ni entidad financiera.

El porciento de interés anual a pagarse por los préstamos personales que se conceden a sus socios, está muy por debajo de lo ofrecido por cualquier banco o financiera.

El ingreso que recibe la Asociación proviene del ahorro compulsorio de sus mismos miembros, o sea, del empleado público. Por ende, los beneficios que esta institución ofrece son sola-

mente para sus socios y no para el consumidor en general. (Énfasis suplido.)

Insatisfecho con esta determinación, la parte demandada acudió ante nos mediante *certiorari* planteando como único señalamiento de error el siguiente:

IV. Primer y Unico Señalamiento de Error

Erró el Honorable Tribunal Superior, Sala de Aguadilla al concluir que la Asociación de Empleados del E.L.A. está exenta de cumplir con las disposiciones de la Ley Federal de Veracidad en los préstamos conocida como "Truth in Lending Act". 15 U.S.C.A. 1601 y siguientes y del Reglamento Z (12 C.F.R. 226).

Decidimos revisar y expedimos el auto solicitado.

## II

■ Ante el rápido incremento en el uso del crédito por parte del consumidor, en el 1968, tras varios años de estudio y debate en el Congreso de Estados Unidos con respecto a la utilidad y necesidad de imponer la obligación a aquellos que regularmente extienden crédito, de revelar de manera uniforme al consumidor el costo real de la transacción que están llevando a cabo para que puedan comparar entre distintas alternativas de crédito, fue aprobada la ley federal conocida como T.I.L.A. Sobre este particular, en *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 363–364 (1973), se dijo que:

By the time of passage, it had become abundantly clear that the use of consumer credit was expanding at an extremely rapid rate. From the end of World War II through 1967, the amount of such credit outstanding had increased from $5.6 billion to $95.9 billion, a rate of growth more than 4 1/2 times as great as that of the economy. Yet, as the congressional hearings revealed, consumers remained remarkably ignorant of the nature of their credit obligations and of the costs of deferring payment. Because of the divergent, and at times fraudulent, practices by which consumers were informed of the terms of the

credit extended to them, many consumers were prevented from shopping for the best terms available and, at times, were prompted to assume liabilities they could not meet. Joseph Barr, then Under Secretary of the Treasury, noted in testifying before a Senate subcommittee that such blind economic activity is inconsistent with the efficient functioning of a free economic system such as ours, whose ability to provide desired material at the lowest cost is dependent on the asserted preferences and informed choices of consumers. (Escolios omitidos.)

 El propósito primordial de la ley fue asegurarle al consumidor el que a la hora de obtener crédito se le revelara de forma significativa y clara los términos de dicho crédito. De esta forma se evitaban las prácticas fraudulentas. 15 U.S.C. sec. 1601;[3] *Garza v. Chicago Health Clubs, Inc.*, 347 F. Supp. 955, 959 ( D. Ill. 1972); *Thomas v. Myers-Dickson Furniture Company*, 479 F.2d 740, 745 (5to Cir. 1973); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559 (1980); *Anderson Bros. Ford et. al v. Valencia et. al.*, 452 U.S. 205, 219 (1981); *Brown v. Marquette Sav. and Loan Ass'n.*, 686 F.2d 608, 612 (7mo Cir. 1982); *Herrera v. First Northern Sav. and Loan Ass'n*, 805 F.2d 896, 900 (10mo Cir. 1986); *Dorothy Edwards Realtors, Inc. v. McAdams*, 525 N.E.2d 1248 (1988). Y es que con

---

[3] La sec. 1601 del Título 15 de U.S.C. dispone:

*"Sec. 1601. Congressional findings and declaration of purpose*

"(a) The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. *It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.*

"(b) The Congress also finds that there has been a recent trend toward leasing automobiles and other durable goods for consumer use as an alternative to installment credit sales and that these leases have been offered without adequate cost disclosures. It is the purpose of this subchapter to assure a meaningful disclosure of the terms of leases of personal property for personal, family, or household purposes so as to enable the lessee to compare more readily the various lease terms available to him, limit balloon payments in consumer leasing, enable comparison of lease terms with credit terms where appropriate, and to assure meaningful and accurate disclosures of lease terms in advertisements." (Énfasis suplido.)

anterioridad a la aprobación de la ley los consumidores no tenían manera de saber realmente cuánto les costaba el crédito obtenido y tampoco podían comparar los ofrecimientos y facilidades de crédito entre varias entidades crediticias. Ello se debía al hecho de que los acreedores no utilizaban una forma uniforme de calcular el interés ni tampoco detallaban los cargos adicionales, los que no se reflejaban en la tasa de interés.

■ Preocupado el Congreso por el hecho de que la legislación aprobada abarcara las distintas modalidades de crédito existentes más las que surgieran en el futuro, decidió que la misma fuera amplia. Por tal razón, delegó en la Junta de la Reserva Federal (en adelante J.R.F.) la facultad de implantar la ley mediante la promulgación de los reglamentos necesarios para hacer efectiva la misma. 15 U.S.C. sec. 1604.([4]) No obstante, subsistía la preocupación en los congresistas de que los acreedores buscaran la forma de evadir los requisitos impuestos por la legislación. Sobre este particular, en *Mourning v. Family Publications Service, Inc.*, supra, págs. 365–366, se dijo lo siguiente:

> The language employed evinces the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish. It indicates as well the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion. In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations designed to "carry out the purposes" of the Act, Congress specifically provided, as noted earlier, that

---

([4]) La sec. 1604 del Título 15 de U.S.C., en lo pertinente, dispone:
*"Sec. 1604. Disclosure guidelines*
*"Promulgation, contents, etc., of regulations*
"(a) The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith."

the regulations may define classifications and exceptions to in-
sure compliance with the Act. ...

The Board was thereby empowered to define such classifica-
tions as were reasonably necessary to insure that the objectives
of the Act were fulfilled, no matter what adroit or unscrupulous
practices were employed by those extending credit to
consumers.

De esta forma surge el Reglamento Z, 12 C.F.R. sec.
226.1 y ss. (1985), el cual tuvo vigencia a partir del 1ro de
julio de 1969. K.E. Keest y E.L. Sarason, Jr., *Truth in Len-
ding*, 2da ed., Boston, National Consumer Law Center,
1989, pág. 32. Así que para disponer del caso de autos de-
bemos primeramente acudir a la ley (T.I.L.A.) y luego al
Reglamento Z. Veamos entonces a quiénes aplican los
mismos.

### III

En un principio, la ley T.I.L.A. definía como acree-
dor a aquella persona que extendía crédito[5] regularmente
e imponía un cargo por financiamiento.[6] Posteriormente,
se añadió a esta definición por la J.R.F. la regla de que
también es un acreedor aquél que extiende crédito paga-
dero en más de cuatro (4) plazos. Esta definición fue cues-
tionada por un acreedor en *Mourning v. Family Publica-
tions Service, Inc.*, supra, pág. 368. El Tribunal Supremo
de Estados Unidos sostuvo en dicho caso que la J.R.F. tenía
autoridad para promulgar reglamentación que previniera
el incumplimiento con las disposiciones del T.I.L.A. y, sobre
todo, que evitara la práctica de ocultar el cargo por finan-

---

[5] La sec. 1602 del Título 15 de U.S.C., en el inciso (e), define el término "cré-
dito" de la manera siguiente:

"(e) The term 'credit' means the right granted by a creditor to a debtor to defer
payment of debt or to incur debt and defer its payment."

[6] La Asociación alegó, en su memorando en oposición a que se expidiera el auto
de *certiorari*, que ésta no cobra gastos por financiamiento, por lo tanto, sostiene que
no le aplica el T.I.L.A.

ciamiento al inflar el precio al contado del producto o mercancía a pagar.([7]) Por tal razón, la sec. 1602 de la ley, 15 U.S.C., en parte del inciso (f), define la palabra "acreedor" de la manera siguiente:

> (f) The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required; and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

■ Es importante destacar que una persona o compañía se convierte en acreedor de acuerdo con esta ley si cumple con uno de los dos (2) criterios establecidos en la misma; es decir, si extiende crédito regularmente sujeto a un cargo por financiamiento o si mediante acuerdo por escrito es pagadero en más de cuatro (4) plazos. Como se podrá notar, la mayoría de las transacciones de crédito del consumidor cumplen con ambos requisitos. Keest y Sarason, Jr., *op. cit.*, pág. 42.

■ Por otra parte, se hace necesario aclarar que un acreedor puede ser una persona natural o una organización, mientras que un consumidor sólo puede serlo una

---

([7]) Con relación a la regla de pagadero en cuatro (4) plazos o más, se ha dicho lo siguiente:

"One of the underlying assumptions for the 'more than four installments' rule is that merchants might circumvent the objective of the TILA by 'burying the cost of credit in the price of the goods sold'. The mere fact that a transaction falls within the more than four installment rule does not necessarily mean that a finance charge is involved. But a transaction within the scope of TILA that has no finance charge, a nominal finance charge, or an unusually high sales price should be regarded with a healthy degree of skepticism as to the accuracy of the finance charge. Indeed a finance charge may be 'hidden' in the inflated cash price.

Proving the hidden finance charge, of course, takes some care. Just because a good or service is overpriced does not necessarily mean that there is a hidden finance charge." (Escolios omitidos.) K.E. Keest y E.L. Sarason, Jr., *Truth in Lending*, 2da ed., Boston, National Consumer Law Center, 1989, pág. 92.

persona natural. A su vez, una organización puede comprender a una corporación, asociación, cooperativa, fideicomiso, etc. Keest y Sarason, Jr., *op. cit.*, pág. 41. Aclarado este punto debemos señalar, además, qué tipos de préstamos están cobijados por la ley. El T.I.L.A. aplica solamente a préstamos primordialmente para uso personal.[8] Reglamento Z, 12 C.F.R. sec. 226.3 (1985); *Semar v. Platte Valley Federal S. & L Ass'n*, 791 F.2d 699, 704 (9no Cir. 1986).

 Ahora bien, para instar una acción en la que se reclama por violaciones al T.I.L.A. hay que demostrar, en primer término, que existe una deuda de acuerdo con la ley y que las partes litigantes son un acreedor y un consumidor. *Beezly v. Fremont Indem. Co.*, 804 F.2d 530–531 (9no Cir. 1986). Tomando en consideración lo anterior, apliquémoslo al caso de autos.

 Ninguna de las partes en el presente caso niega la existencia de la deuda, cuyo pago fue diferido. La misma surgió como parte de un préstamo personal solicitado por el señor Vázquez Pérez, el cual le fue concedido. La deuda sería pagada en treinta y un (31) plazos, y la misma no estaba sujeta a cargo por financiamiento alguno. Dicho préstamo le fue otorgado al señor Vázquez Pérez por la Asociación. Esta es una entidad "creada gubernamentalmente para fines de interés público, como es la protección

---

[8] Las transacciones siguientes no están cobijadas por el T.I.L.A., de acuerdo con la sec. 1603 del Título 15 de U.S.C.:

"(1) Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, or to organizations.

(2) Transactions in securities or commodities accounts by a brokerdealer registered with the Securities and Exchange Commission.

(3) Credit transactions, other than those in which a security interest is or will be acquired in real property, or in personal property used or expected to be used as the principal dwelling of the consumer, in which the total amount financed exceeds $25,000.

(4) Transactions under public utility tariffs, if the Board determines that a State regulatory body regulates the charges for the public utility services involved, the charges for delayed payment, and any discount allowed for early payment."

de nada menos que de los propios empleados gubernamentales. Ni es un negocio privado ni tiene fines de lucro o especulación". *Berríos Miranda v. Asociación de Empleados*, 88 D.P.R. 809, 820 (1963). Como parte de los servicios que presta a los empleados del Gobierno está el otorgar préstamos. Sec. 3 de la Ley Núm. 133 de 28 de junio de 1966 (3 L.P.R.A. sec. 862b). Tal actividad es llevada a cabo regularmente. Por lo tanto, no hay duda alguna de que en el caso de autos la Asociación es un acreedor de acuerdo con la T.I.L.A. y el señor Vázquez Pérez un consumidor. El hecho de que la Asociación es una entidad sin fines de lucro que sólo presta a sus miembros a un interés más bajo que el prevaleciente en el mercado no la exime de cumplir con las disposiciones del T.I.L.A. Recordemos que las cooperativas son entidades sin fines de lucro que solamente prestan a sus socios, también a un interés más bajo, sin embargo, están sujetas a la ley. Por lo tanto, en este punto no podemos estar de acuerdo con el tribunal de instancia. Habiéndose determinado que a la Asociación le aplican las disposiciones del T.I.L.A., veamos entonces en qué consistió la violación en que se incurrió en el caso ante nos.

IV

El T.I.L.A. es esencialmente una ley que impone la obligación de divulgarle al consumidor cierta información que se considera esencial para que éste pueda tener un conocimiento informado del costo de la transacción que está efectuando. Se ha sostenido reiteradamente que la información más importante que tiene que ofrecérsele al consumidor, de acuerdo con la T.I.L.A., es el cargo por financiamiento y la tasa de porciento anual. Esta información representa el costo del crédito para una transacción en particular. 15 U.S.C. sec. 1638; Reglamento Z, 12 C.F.R. sec. 226.6 (1985); *Herrera v. First Northern Sav. and Loan Ass'n*, supra, pág. 900; *Thomas v. Myers-Dickson Furniture*

*Company*, supra, pág. 745; *First Acadiana Bank v. Federal Deposit Ins. Corp.*, 833 F.2d 548, 551 (5to Cir. 1987).

Por otra parte, la jurisprudencia ha establecido que tiene que cumplirse estrictamente con los requisitos técnicos de la ley. Así, en *Smith v. Chapman*, 614 F.2d 968, 971 (5to Cir. 1980), se dijo:

> Second, the applicable standard is strict compliance with the technical requirements of the Act. Only adherence to a strict compliance standard will promote the standardization of terms which will permit consumers readily to make meaningful comparisons of available credit alternatives.

La Asociación, por su parte, aceptó, en su memorando en oposición a que se expidiera el auto de *certiorari*, que de la notificación de préstamo concedido surge la información siguiente:

— Nombre y dirección del socio.
— Agencia de trabajo.
— Importe total del préstamo concedido.
— Intereses a descontar
— Préstamos anteriores a descontar.
— Otros descuentos como prima para garantía especial y seguro de deuda.
— Total de descuentos.
— Balance a favor del socio.
— Número de plazos y cantidad mensual a pagar.
— Fecha en que habrá de hacer el primer y último pago.
— Fecha en que podrá renovar el préstamo.

■■■ Alega que el hecho de que la hoja de notificación de préstamo no indique los cargos por financiamiento, partida que no se cobra en los préstamos que otorga la Asociación, ni el tipo de interés que se está cobrando, no exime al demandado del cumplimiento de la obligación. Sostiene, además, que los intereses de los socios a quienes la Asociación presta dinero están debidamente protegidos por la propia ley de la Asociación y sus Reglamentos, y que la T.I.L.A. no aplica cuando existe legislación estatal que provee la pro-

tección que ésta ofrece a los consumidores de crédito. Añade que la T.I.L.A. y su Reglamento dispone, en su parte pertinente, que si existe legislación estatal no incompatible con la federal, prevalecerá la local. 15 U.S.C. sec. 1610.([9]) De acuerdo con los hechos del caso de autos no le asiste la razón a la Asociación. Veamos.

 La ley que crea la Asociación de Empleados es anterior al T.I.L.A. La misma no contiene disposición alguna que establezca qué información debe detallársele al socio al éste solicitar un préstamo y concedérsele el mismo. Tampoco el Reglamento de la Asociación de Empleados del

---

([9]) La sec. 1610 de la ley federal T.I.L.A., 15 U.S.C., dispone lo siguiente:

*"Sec. 1610. Effect on other laws*

*"Inconsistent provisions; procedures applicable for determination*

"(a)(1) This part and parts B and C of this subchapter do not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency. Upon its own motion or upon the request of any creditor, State or other interested party which is submitted in accordance with procedures prescribed in regulations of the Board, the Board shall determine whether any such inconsistency exists. If the Board determines that a State-required disclosure is inconsistent, creditors located in that State may not make disclosures using the inconsistent term or form, and shall incur no liability under the law of that State for failure to use such term or form, notwithstanding that such determination is subsequently amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

"(2) Upon its own motion or upon the request of any creditor, State, or other interested party which is submitted in accordance with procedures prescribed in regulations of the Board, the Board shall determine whether any disclosure required under the law of any State is substantially the same in meaning as a disclosure required under this subchapter. If the Board determines that a State-required disclosure is substantially the same in meaning as a disclosure required by this subchapter, then creditors located in that State may make such disclosure in compliance with such State law in lieu of the disclosure required by this subchapter, except that the annual percentage rate and finance charge shall be disclosed as required by section 1632 of this title.

*"State credit charge statutes*

"(b) This subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply."

Gobierno de Puerto Rico de 31 de julio de 1963,([10]) contiene disposición alguna a tales efectos. La Ley de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico fija el máximo de interés anual que puede cobrar la Asociación en un 7%. Sec. 7 de la Ley Núm. 133, *supra*, 3 L.P.R.A. sec. 862f. Pero el hecho de que se indique en la ley el por ciento máximo de interés anual, no es suficiente para que el socio tenga una idea exacta del costo real del préstamo obtenido. Tiene que cumplirse con lo indicado por el Reglamento Z, 12 C.F.R. sec. 226.8 (1985). En otras palabras, debe ofrecérsele dicha información en la hoja de notificación de préstamo y resaltarla del resto de la información.([11])

 Con relación a la alegación de la Asociación de que si existe legislación estatal que provea la protección que ofrece la legislación federal no aplicará la federal, sobre este punto se ha sostenido que los requisitos estatales sobre información al consumidor tienen que ser sustancialmente similares a los exigidos por la ley federal o más amplios.([12]) De lo contrario, aplicará la ley federal. Keest y

---

([10]) Hemos examinado el Reglamento de Préstamos de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico de 27 de septiembre de 1978 y de 30 de marzo de 1988. El mismo tampoco contiene disposición alguna referente a la información que debe indicársele al socio en la hoja de notificación de préstamo.

([11]) Se ha señalado con respecto a la tasa de por ciento anual lo siguiente:

"The 'annual percentage rate' must be disclosed using that term, and a brief description of the annual percentage rate must also be provided; the Regulation suggests using the description 'the cost of your credit as a yearly rate.'" Keest y Sarason, Jr., *op. cit.*, pág. 121.

([12]) La Sec. 224.28(a)3 del citado libro de Keest y Sarason, Jr. dispone:

"Generally, state law requirements that call for the disclosure of items of information not covered by the Federal Law, or that require more detailed disclosures, do not contradict the federal requirements."

Bajo las Secs. 226.29(a)2 y 226.29(a)3 (*State Exemptions*), el libro de Keest y Sarason, Jr., *op. cit.*, págs. 508–509, dispone, como regla general, lo siguiente:

"2. The 'substantially similar' standard requires that state statutory or regulatory provisions and State interpretations of those provisions be generally the same as the federal act and Regulation Z. This includes the requirement that state provisions for reimbursement to consumers for overcharges be at least equivalent to those required in section 108 of the act.

Sarason, Jr., *op. cit.*, pág. 56. No encontramos que la ley que crea la Asociación contenga tales requisitos de divulgación.

██ Por último, la ley federal provee para la imposición de penalidades civiles y criminales contra los acreedores que violenten sus disposiciones. 15 U.S.C. secs. 1611 y 1640.([13]) Sin embargo, las agencias del Gobierno federal y

---

"3. The standard requiring adecuate provision for enforcement generally means that appropriate state officials must be authorized to enforce the state law through the procedures and sanctions comparable to those available to federal enforcement agencies. Furthermore, state law must make adequate provision for enforcement of the reimbursement rules."

([13]) Las secs. 1640 y 1611 del Título 15 de U.S.C., disponen en lo pertinente al caso de autos, lo siguiente:

"*Sec. 1640. Civil liability*

"*Individual or class action for damages; amount of award; factors determining amount of award*

"(a) Except as otherwise provided in this section,.any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

"(1) any actual damage sustained by such person as a result of the failure;

"(2) (A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; or

"(B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimun recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor; and

"(3) in the case of any succesful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

"*Sec. 1611. Criminal liability for willful and knowing violation*

"Whoever willfully and knowingly

"(1) gives false or inaccurate information or fails to provide information which he is required to disclose under the provisions of this subchapter or any regulation issued thereunder,

"(2) uses any chart or table authorized by the Board under section 1606 of this title in such a manner as to consistently understate the annual percentage rate determined under section 1606(a)(1)(A) of this title, or

"(3) otherwise fails to comply with any requirement imposed under this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year, or both."

de los gobiernos estatales no están sujetas a estas sanciones. A pesar de ello, sí tienen el deber de informarle al consumidor el tipo de interés a cobrarse. 15 U.S.C. sec. 1612.([14]) Pasemos a considerar si la Asociación es una agencia del Gobierno del Estado Libre Asociado de Puerto Rico.

La ley que crea la Asociación no define si ésta es una agencia, departamento, instrumentalidad o corporación pública. En *First Federal v. Srio. de Hacienda*, 86 D.P.R. 56, 70 (1962), dijimos que la Asociación es " 'una institución pública de carácter compulsorio para todos los empleados y funcionarios públicos' del Gobierno de Puerto Rico 'siendo sus fines estimular el ahorro entre sus asociados y asegurarlos contra inutilidad física o muerte, efectuar préstamos, proveerlos de hogares y clínica para el tratamiento médico de ellos y sus familiares ...' ". Más adelante, señalamos que "[d]icha institución se gobierna por una Junta de Directores en la cual, por mandato de la ley, cada una de las tres ramas del gobierno, la Legislativa, la Ejecutiva y la Judicial tienen representantes". Íd., pág. 71.

Por otra parte, los empleados de la Asociación no están cubiertos por la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. sec. 1301 y ss.). La entidad sólo presta servicio a los empleados públicos, quienes por ley están obligados a pertenecer a la misma. La Asociación tiene personalidad

---

([14]) El inciso (b) de la sec. 1612 del Título 15 de U.S.C. dispone:

"*Inapplicability of Federal civil or criminal penalties, to Federal, state, and local agencies*

"(b) No civil or criminal penalty provided under this subchapter for any violation thereof may be imposed upon the United States or any department or agency thereof, or upon any State or political subdivision, thereof, or any agency of any State or political subdivision."

Es importante aclarar que cuando se menciona la palabra "estado" en esta ley, se refiere también al Estado Libre Asociado de Puerto Rico.

jurídica y capacidad para demandar y ser demandada. Su Junta de Directores puede llevar a cabo transacciones a nombre de la Asociación para adquirir y poseer bienes en cualquier forma legal para realizar los fines de la Asociación. Puede enajenar, vender, gravar, permutar, traspasar, dar opciones de venta, vender a plazos, dar en arrendamiento o de otro modo disponer de sus bienes. Está autorizada para tomar préstamos y garantizar el pago de los mismos y sus intereses. Puede hipotecar, prorrogar, dar en prenda y gravar en cualquier otra forma las propiedades de la Asociación. Está facultada por ley a aceptar donaciones y/o aportaciones de individuos e instituciones, del gobierno municipal y estatal, y del Gobierno de Estados Unidos, para usarlas y/o parearlas con fondos de la Asociación en el desarrollo de proyectos o facilidades en beneficio de sus socios y del público en general. Véase 3 L.P.R.A. sec. 862f.

■■■ La Asociación no recibe ayuda económica alguna del Gobierno de Puerto Rico y funciona de manera muy parecida a una cooperativa de ahorro y crédito; se alimenta del salario mensual de los empleados públicos. A éstos se les descuenta no menos del tres por ciento (3%) de su salario mensual a través del Fondo de Ahorro y Préstamo.

El dinero que la Asociación no utiliza en préstamos a sus socios se invierte, con la aprobación del Secretario de Hacienda, en bonos del Gobierno o de corporaciones públicas y privadas, lo que genera ingresos adicionales en la forma de dividendos.

Además, la Asociación recibe otros ingresos por el alquiler de apartamentos en su centro vacacional en Guánica y por el alquiler de espacios para oficinas en su edificio principal en Hato Rey. Véase Manual del Asociado de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico.

■■■ Un dato muy importante es que la Asociación es

dirigida por los mismos empleados públicos que la componen, es decir, por sus socios.

La sec. 863f del Título 3 de L.P.R.A. fue enmendada el 11 de agosto de 1988 para eliminar el poder de supervisión que tenía el Secretario de Hacienda sobre los fondos de la Asociación. A tales efectos, la citada sec. 863f dispone que "los fondos de la Asociación serán depositados por la Junta de Directores en uno o más bancos del Estado Libre Asociado de Puerto Rico, prefiriéndose a la institución bancaria que en igualdad de condiciones ofrezca mayor tipo de interés".

Por otra parte, la sec. 863a del Título 3 de L.P.R.A. declara exentas de pago de todo derecho la inscripción y cancelación en el Registro de la Propiedad de toda clase de escrituras y otros documentos relativos a préstamos hipotecarios concedidos por la Asociación. Además, ordena a los registradores a que faciliten, libre de costo alguno, todos los informes y certificaciones que solicite el Director Ejecutivo de la Asociación acerca de las propiedades que posean las personas propuestas como fiadores de los préstamos que se tramiten en la Asociación.

De todo lo antes expuesto, se puede colegir que, aunque la Asociación es un organismo creado gubernamentalmente, altamente reglamentado, cuyo propósito es implantar la política gubernamental del Gobierno del Estado Libre Asociado de Puerto Rico de estimular el ahorro entre los empleados públicos, no puede considerarse como agencia, departamento, instrumentalidad o corporación pública del Gobierno. Por tal razón, es menester concluir que la Asociación sí está sujeta a las penalidades que provee la T.I.L.A. *Cabe señalar además que, a pesar de que la Asociación tiene que cumplir con las penalidades de la T.I.L.A., la deuda del señor Vázquez Pérez con la Asociación subsiste y ésta puede exigir el pago de la misma. No procede en este caso la rescisión que provee la T.I.L.A.*

 La sec. 1640 de la T.I.L.A., 15 U.S.C., provee para la imposición de daños alegados por la persona afectada como resultado del incumplimiento con los requisitos de divulgación que impone la ley. Dicha concesión de daños dependerá de los que el consumidor pueda probar que resultaron como consecuencia del incumplimiento del acreedor. En el caso de autos no se alegó daño alguno por parte del consumidor y mucho menos desfiló prueba de ello.

 No obstante, la sec. 1640 de la T.I.L.A., *supra*, en su inciso (3), dispone para la concesión de las costas del litigio y honorarios de abogado en una acción instada por el consumidor, en la que éste salga airoso, para hacer cumplir al acreedor con las disposiciones de la ley.

En virtud de lo anterior, *se revoca la sentencia del Tribunal Superior, Sala de Aguadilla, de 27 de abril de 1987 y se ordena a la Asociación de Empleados del Estado Libre Asociado de Puerto Rico a que cumpla con las disposiciones de la ley federal conocida como "Truth in Lending Act". Se conceden honorarios de abogado en la cantidad de cuatrocientos dólares ($400.00) y se devuelve el caso para que se haga la debida determinación de las costas a tenor con lo que dispone el inciso (3) de la sec. 1640 de la T.I.L.A.*

El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y de conformidad. El Juez Asociado Señor Fuster no intervino.

— O —

Opinión concurrente y de conformidad emitida por el Juez Asociado Señor Hernández Denton.

Suscribo la opinión del Tribunal que extiende el *Truth in Lending Act*, 15 U.S.C. sec. 1601 *et seq.*, a los préstamos otorgados por la Asociación de Empleados del Estado Libre

Asociado de Puerto Rico. Esta legislación federal es uno de los instrumentos más efectivos e importantes de protección al consumidor que rigen la otorgación de crédito en Estados Unidos y Puerto Rico. Sus requisitos de divulgación del costo del crédito permite que todos los consumidores puedan obtener la información sobre los términos de crédito y, en particular, la tasa periódica anual de interés y los cargos de financiamiento cobrados por las distintas entidades financieras. La ley establece unos requisitos uniformes para el cómputo de la tasa periódica anual (*annual percentage rate*) y de los cargos de financiamiento, y requiere que el costo total de estos cobros se divulguen antes de que se efectúe una transacción. De esta manera se facilita al consumidor la información que necesita para hacer una selección entre las alternativas de crédito disponibles en el mercado.

Además de su propósito de proteger al consumidor, el estatuto evita prácticas fraudulentas en la otorgación de crédito y asegura que todos los que proveen crédito al consumidor observen unas reglas y adopten unas medidas cautelares para evitar sus penalidades.

> It was both consumer protection legislation, recognizing "the right to be informed —to be protected against fraudulent, deceitful, or grossly misleading information, advertising, labeling, or other practices, and to be given the facts the needs to make an informed choice" and legislation designed to protect the "ethical and efficient lender or credit extender", thus invigorat[ing] competition. Further, it was felt that an informed consumer credit market would help stabilize the economy by encouraging consumer restraint when interest rates increase, and consumer activity when rates drop "as economic activity recedes". K.E. Keest y E.L. Sarason, Jr., *Truth in Lending*, 2da ed., Boston, National Consumer Law Center, 1989, pág. 26.

La Asociación de Empleados del Estado Libre Asociado no es "un negocio privado ni tiene fines de lucro o especulación". *Berríos Miranda v. Asociación de Emplea-*

*dos*, 88 D.P.R. 809, 820 (1963). Es una entidad creada para promover el bienestar social, económico y físico de los empleados públicos que realmente funciona como una cooperativa de ahorro y crédito. La Asociación rinde un valioso servicio a todos los empleados regulares de agencias gubernamentales que están obligados por ley a pertenecer a la entidad y a quienes se les descuenta un por ciento de su salario mensual para ahorros.

La entidad ofrece a sus socios distintos tipos de servicios. Entre éstos, los más importantes son su programa de préstamos que incluyen desde los personales hasta los de seguro de automóvil. Para los empleados públicos y los pensionados acogidos al Fondo de Ahorro y Préstamos, la Asociación provee una alternativa de crédito a las entidades financieras que operan con ánimo de lucro y a las cooperativas de ahorro y crédito. De hecho, miles de empleados públicos anualmente obtienen préstamos de la Asociación para atender algunas necesidades apremiantes. En 1991 la Asociación prestó la cantidad de $638.3 millones a sus socios. Véase *Estadísticas de Deudas de Consumidores*, Negociado de Estudios Económicos y Sociales, Junta de Planificación, 1991.

Por la importancia de estos servicios, sus operaciones deben ser ejemplarizantes. Fiel a sus postulados, la Asociación debe estar siempre a la vanguardia en sus servicios a los asociados, y sus programas de orientación deben divulgar toda la información sobre las condiciones y el costo del financiamiento que necesitan los consumidores para hacer una selección juiciosa entre las alternativas de crédito disponibles. De esta manera cumple efectivamente con sus propósitos sociales y económicos de proveerles a los empleados públicos una verdadera alternativa que le ofrezca a éstos acceso a la banca comercial en sus ahorros y en sus transacciones de crédito.

Considerando sus propósitos y los servicios ofrecidos a sus miembros, nos sorprende que la Junta de Directores de la Asociación haya hecho caso omiso desde su aprobación e

insista en la inaplicabilidad del *Truth in Lending Act* en sus operaciones financieras. En la eliminación de esta práctica es que radica el valor de nuestra adjudicación.

Por las anteriores consideraciones, suscribo la opinión del Tribunal.