Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| BANCO POPULAR DE PUERTO RICO<br><br>Demandante-Apelado<br><br>v.<br><br>ALFREDO ANTONIO CASTELLANOS BAYOUTH, su esposa REBECCA LÓPEZ GONZÁLEZ y la Sociedad Legal de Gananciales Compuesta por Ambos<br><br>Demandados-Apelantes | KLAN202301157 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso Núm. NSCI2015-00846 Sala:303<br><br>Sobre:<br>Cobro de Dinero y Ejecución de Hipoteca por la vía ordinaria |
| --- | --- | --- |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Salgado Schwarz y el Juez Ronda Del Toro.

Salgado Schwarz, Carlos G., Juez Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de abril de 2024.

Comparece ante nos el señor Alfredo Castellanos Bayouth y la señora Rebecca López González (apelantes) mediante recurso de apelación. Nos solicitan la revisión de la Sentencia Parcial emitida por el Tribunal de Primera Instancia, Sala Superior de Fajardo (TPI). Mediante esta, el TPI desestimó la reconvención incoada por los apelantes.

Por los fundamentos que expondremos a continuación, **revocamos** el dictamen apelado y **devolvemos** el asunto al tribunal de instancia, para procedimientos conforme lo aquí dispuesto.

**-I-**

Según surge del expediente ante nuestra consideración, el 10 de julio de 2009, los apelantes suscribieron un pagaré hipotecario a favor de

Westernbank Puerto Rico por la suma principal de $292,000.00, más intereses. El 10 de julio de 2009, los apelantes otorgaron una Escritura de Primera Hipoteca sobre un apartamento residencial ubicado en el Municipio de Fajardo y que constituye su vivienda principal.[1] Esto, en aseguramiento del pagaré hipotecario, cuyo tenedor por endoso es el Banco Popular de Puerto Rico (BPPR).

Para finales del año 2014, los apelantes sufrieron una merma sustancial en sus ingresos. Ante el temor de incumplir con su obligación de pago o de perder su hogar, los apelantes presentaron una solicitud de mitigación de pérdidas ante el BPPR el 18 de diciembre de 2014. Presentada la solicitud, los apelantes y el personal de la División de Mitigación de Pérdidas del BPPR intercambiaron numerosos correos electrónicos con el fin de completar el expediente. El 21 de abril de 2015, la señora Darilis Vázquez Cuadrado de la División de Mitigación de Pérdida les informó a los apelantes que su expediente estaba completado y que procederían a trabajar una posible modificación sujeto a la aprobación del inversionista.[2] Además, les informó que los posibles términos de la modificación serían por un interés de 2.5% a 48 meses con un pago aproximado de $900.

Luego de recibir la mencionada confirmación, los apelantes suscribieron un correo electrónico al Sr. Shenielle Hernández de la División de Mitigación de Pérdida mediante el cual preguntaron "[¿]Debo entender entonces que no hago ningún pago hasta que me notifiques?".[3] El Sr. Shenielle Hernández contestó la misiva con el siguiente mensaje: "Correcto. El pago lo

---

[1] Apéndice del Recurso en Oposición, página 56.
[2] Apéndice del Recurso, página 47.
[3] Apéndice del Recurso, página 48.

va a traer en giro o *money order* el día que le llamen que pase a firmar el acuerdo".[4] Finalmente, el 1 de octubre de 2015, los apelantes recibieron un mensaje del Sr. Shenielle Hernández indicando lo siguiente:

> Saludos,
>
> Adjunto documentos de razón de atraso para caso en referencia ya que fue consultado con el área de aprobaciones y debemos firmar un trial en lo que se recibe subordinación de préstamos especiales. ***Los documentos del expediente están vencidos por lo que se deben actualizar ingresos y gastos para firmar el mismo. El expediente actual se debe inactivar por lo que recibirán una carta dejando saber que fue inactivo el expediente.*** Una vez recompile la información actualizada de ingresos y gastos debe traerlos junto con los documentos adjuntos en el email.[5]

Fue con este comunicado que BPPR les informó a los apelantes, por primera vez, que lo documentos requeridos para el proceso de mitigación de pérdidas tenían fecha de vencimiento, que al llegar esa fecha se inactivaría su expediente y que dicho plazo estaba próximo a vencer. Todo esto, sin proveerle un aviso a los apelantes para que estos pudieran tomas las acciones correspondientes previo a la inactivación de su expediente. Así las cosas, los apelantes se dispusieron a cumplir con los solicitado por BPPR y así lo hicieron constar mediante correo electrónico del 8 de octubre de 2015.[6]

El 10 de noviembre de 2015, los apelantes se comunicaron la División de Mitigación Pérdida para informarles que, por asuntos personales, su contable estaría fuera de Puerto Rico. Por ello, someterían la información solicitada dentro de lo días siguientes. El 17 de noviembre de 2015, los apelantes sometieron la documentación.

---

[4] Apéndice del Recurso, página 49 y 73.
[5] Apéndice del Recurso, página 50.
[6] Apéndice del recurso, página 152.

El 2 de diciembre de 2015, el BPRR presentó una demanda sobre cobro de dinero y ejecución de hipoteca por la vía ordinaria. En esencia, solicitó el pago de una suma ascendente a $235,379.00 por concepto del principal, más los intereses anuales del 5.8% pagaderos desde el 1 de febrero de 2015. Solicitó, además, la suma de $29,200.00 por concepto de costas, gasto y honorarios de abogados. También solicitó cualesquiera sumas de dinero por concepto de primas de seguro hipotecario y riesgo, recargos por demora y cualquier otra cantidad pactada en la escritura de primera hipoteca. Finalmente, el BPPR solicitó que, una vez adviniera final y firme la sentencia, se procediera con la ejecución de la hipoteca mediante la venta en pública subasta del inmueble gravado con la hipoteca.

El 11 de abril de 2015, lo apelantes presentaron su *Contestación a Demanda y Reconvención*. En síntesis, los apelantes alegaron que BPPR no podía presentar una demanda en su contra porque las partes se encontraban en negociaciones y gestiones para la posible mitigación de pérdidas. Arguyeron que el proceder del BPPR constituía *dual tracking* bajo reglamentaciones federales y violaciones al *Dodd-Frank Act*, el *Truth in Lending Act* y el Reglamento X conocido como del *Real Estate Settlement Procedures Act* (RESPA). Indicaron, además, que el incumplimiento de su obligación de pago de la hipoteca se debió a la información que el propio BPPR le proveyó a los apelantes. Estas actuaciones, según alegaron los apelantes, les ocasionaron daños ascendientes a una suma no menor de $1,000,000.

Así las cosas, los apelantes presentaron una *Moción de Sentencia Sumaria* el 14 de abril de 2016. Solicitaron

la desestimación de la demanda en su contra por violar reglamentos y estatutos federales. Los apelantes enmendaron su moción de sentencia sumaria mediante moción del 19 de abril de 2016. Luego de varios tramites procesales, el 8 de junio de 2016, BPPR presentó su *Oposición a Moción de Sentencia Sumaria Enmendada y Solicitud para que se Dicte Sentencia Sumaria Parcial Desestimando Reconvención*. En apretada síntesis, BPPR alegó que no existen hechos constitutivos bajo RESPA. Razonó que, al momento de radicarse la demanda, la solicitud de mitigación de perdida no se había completado y que la falta de pago solo es atribuible a los apelantes ya que se les advirtió que debían llevar ciertos pagos para el inicio de un periodo probatorio que estaba condicionado, pero nunca se llegó a un acuerdo final. BPPR niega haber instruido a los apelantes no realizar los pagos.

Trabada así la controversia, el 2 de octubre de 2023, el TPI emitió una *Sentencia Sumaria Parcial* mediante la cual desestimó la reconvención presentada por los apelantes. En ella, incluyó las siguientes determinaciones de hechos incontrovertido:

1. El 2 de diciembre de 2015, l Banco Popular de Puerto Rico presentó una demanda sobre cobro de dinero y ejecución de hipoteca por la vía ordinaria contra Alfredo Antonio Castellanos Bayouth, su esposa Rebecca López González y la Sociedad Legal de Bienes Gananciales compuesta por ambos.

2. La parte demandante es la tenedora por endoso de un pagaré hipotecario suscrito el día 10 de julio de 2009, ante el notario público Roberto García Rodríguez, por la suma principal de $292,000.00, más intereses convenidos al 3.75% durante los primeros tres (3) años y al 5.8% anual durante el resto de los pagos aplicados al principal e intereses y otros créditos accesorios.

3. En aseguramiento del pagaré hipotecario antes mencionado, la parte demandada otorgó la Escritura Núm. 396 sobre Primera Hipoteca, el 10 de julio de 2009, ante el notario público Roberto M. García Rodríguez sobre la siguiente propiedad:

URBANA: Propiedad Horizontal. Unidad de apartamento residencial de 2 niveles identificada con el #401 ubicada en los niveles 4to y 5to del edificio H en The Sunset Village del condominio The Ocean Club at Seven Seas, en el barrio Las Cabezas del municipio de Fajardo, Puerto Rico, con una cabida superficial total de aproximadamente 254,6992 metros cuadrados, equivalentes a 2,741.5417 pies cuadrados. Su entrada principal está en su colindancia Norte en el nivel 4to, siendo sus linderos los siguientes:

En el primer nivel: por el NORTE, en una distancia de 1.90 metros, más 0.61 metros, con espacio exterior, en 2.62 metros, con área común y 7.49 metros, con el apartamento HW-402; por el SUR, en una distancia de 12.01 metros, con el apartamento GW-402; y en 0.61 metros, con espacio exterior; por el ESTE, en una distancia de 7.09 metro, más 2.36 metros, con espacio exterior, y en 1.37 metros, con área común; y por el OESTE, en una distancia de 1.60 metros, más 1.60 metros, más 7.62 metro, con espacio exterior. En el segundo nivel: por el NORTE, en una distancia de 1.90 metros, más 1.07 metros, con espacio exterior y en 10.11 metros, con el segundo nivel del apartamento HW-402; por el SUR, en una distancia de 12.01 metros, con el segundo nivel del apartamento GW-402 y en 1.07 metros, con espacio exterior; por el ESTE, en una distancia de 7.09 metros, con espacio exterior, y en 3.73 metros, área común; y por el OESTE, en una distancia de 1.60 metros, más 1.60 metros, más 7.62 metros, con espacio exterior.

Contiene en el primer nivel: sala-comedor, cocina, balcón cubierto un cuarto principal con un baño completo y un closet de pared, dos cuartos adicionales con un closet de pared cada uno, un baño completo en el pasillo y closet de lavandería y una escalera de espiral que conduce al segundo nivel. Contiene en el segundo nivel: área de foyer salón familiar, baño completo con ducha, un closet de pared y una terraza descubierta.

Le corresponde dos espacios de estacionamientos descubierto, con cabida cada uno para un automóvil, identificados en el correspondiente plano con el mismo número que se identifica a la unidad; y una participación en los elementos comunes del condominio, que incluye sus anejos, de 0.4749%.

4. La parte demandada comenzó una solicitud de mitigación de pérdida para el 18 de diciembre de 2014.

5. La solicitud de mitigación de pérdida nunca fue completada en su totalidad y no se llegó ni firmó ningún acuerdo a tales efectos.

6. El demandante hizo solicitudes a la parte demandada para completar la solicitud de mitigación de pérdida el 26 de diciembre de 2014, 14 de enero de 2015, 5 de marzo de 2015.

7. El 15 de abril de 2015 el demandante informó a la demandada que se completó el expediente y se estaría trabajando una posible modificación, **sujeto a la aprobación del inversionista.**

8. El 26 de mayo de 2015, el demandante informó al demandado de la exigencia de un periodo de prueba una vez ello estuviera aprobado y firmado.

9. El 8 de junio de 2015, el demandante informó a la demandada que se estaría en un proceso evaluativo.

10. El 1 de octubre de 2015, el demandante informó y reiteró al demandado que se debía firmar un proceso de prueba, pero los documentos estaban vencidos pro lo que se debían actualizar éstos y ofrecer información dirigida a los ingresos y gastos. Detalló que su solicitud se **inactivaría ante ello.**

11. El 8 de octubre de 2015, el demandado informó que su contable estaba trabajando sobre los documentos necesarios.

12. El 2 de diciembre de 2015 se presentó la demanda. A ese momento, no existía una solicitud de mitigación de pérdida completada.

13. Posteriormente, las partes continuaron comunicaciones para completar la solicitud de mitigación de pérdida. Empero, finalmente se ofrece un periodo probatorio el 30 de marzo de 2016, el cual no fue aceptado por la parte demandada.

El TPI concluyó que la reconvención de los apelantes era improcedente debido a que, al momento de la presentación de la demanda, no existía un proceso de mitigación. Por ello, el TPI no podía concluir que se habían violentado reglamentos y ni estatutos federales.

Inconformes con el dictamen, los apelantes presentaron un Moción de Reconsideración el 23 de octubre de 2023. El TPI declaró No Ha Lugar dicha moción.

Insatisfechos aún, el 28 de diciembre de 2023, los apelantes acudieron ante este foro y alegaron la comisión de los siguientes errores:

I. Erró el Tribunal de Primera Instancia al resolver que el Banco Popular de Puerto Rico no violó el Reglamento X del *Real Estate Settlement Procedures Act* al notificar una demanda de ejecución de hipoteca contra una parte que estaba en proceso de mitigación de pérdidas a la cual nunca se le notificó que sus documentos tenían fecha de caducidad ni una fecha límite para proveer documentos adicionales.

II. Erró el Tribunal de Primera Instancia al resolver que era un hecho incontrovertible que al momento de presentarse la demanda no existía un proceso activo y completo de mitigación de pérdidas cuando la solicitud del Apelante debía considerarse como "completa de su faz" según el Reglamento X del *Real Estate Settlement Procedures Act*.

III. Erró el Tribunal de Primera Instancia al desestimar la reconvención del demandado por la vía sumaria sin que el promovente haya presentado prueba de que no existía controversia sobre un hecho esencial sin el cual no se podía adjudicar la controversia a la luz del derecho aplicable.

Por su parte, BPPR compareció mediante *Alegato del Apelado Banco Popular de Puerto Rico*. En síntesis, nos solicita que confirmemos el dictamen apelado por cuatro asuntos. Primeramente, a la fecha de la presentación de la demanda no existía una solicitud activa de mitigación de pérdidas y, por ello, no se le puede imputar la comisión de *dual tracking*. Segundo, el alegado incumplimiento con el Reglamento X al que aluden los apelantes es una reclamación nueva que no formó parte de la reconvención. Tercero, los apelantes no cumplieron

con las exigencias de la Regla 36 de Procedimiento Civil, ni en su moción de sentencia sumaria ni en su oposición a la solicitud de desestimación sumaria, al no controvertir los hechos probados por BPPR. Finalmente, BPPR alega que no existe controversia de hecho alguna.

Con el beneficio de la comparecencia de las partes y resumidos los hechos que originan la presente controversia, examinemos el derecho aplicable.

-II-

### A. La Sentencia Sumaria y su revisión por el Tribunal de Apelaciones

Es norma conocida que en nuestro ordenamiento jurídico el mecanismo de la sentencia sumaria está regido por la Regla 36 de Procedimiento Civil.[7] La sentencia sumaria es el mecanismo procesal que les permite a los tribunales disponer de ciertos casos cuando los hechos no están en controversia y el derecho favorece la posición de la parte que la solicita. Mediante la moción de sentencia sumaria, se busca la solución justa, rápida y económica de los litigios civiles que no presentan controversias genuinas de hechos materiales y que, por lo tanto, no requieren la celebración de un juicio en su fondo ya que lo único que resta es dirimir una o varias controversias de derecho.[8]

En virtud de la Regla 36.1 de Procedimiento Civil, la parte reclamante en un pleito puede presentar una moción fundada en declaraciones juradas o aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia

---

[7] 32 LPRA Ap. V, R. 36.
[8] *Vera v. Dr. Bravo*, 161 DPR 308, 331 (2004).

sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.[9]

No obstante, nuestro Tribunal Supremo ha sido enfático en que *solo procede que se dicte sentencia sumaria cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable* y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia.[10] En primer lugar, el promovente de la moción tiene que establecer su derecho con claridad y debe demostrar que no existe controversia en cuanto a ningún hecho material, o sea, sobre ningún componente de la causa de acción.[11] En segundo lugar, el oponente viene obligado a establecer que existe una controversia que sea real en cuanto a algún hecho material y, en ese sentido, no cualquier duda es suficiente para derrotar la solicitud de sentencia sumaria.[12]

En esencia, como principio general, los tribunales están impedidos de dictar sentencia sumaria en cuatro instancias: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) cuando de los propios documentos que acompañan la moción surge que existe una controversia sobre algún hecho material y esencial; o (4) cuando como cuestión de derecho no procede.[13]

---

[9] 32 LPRA Ap. V, R. 36.1.
[10] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109-110 (2015). Énfasis suplido.
[11] *Id*. en la pág. 110.
[12] *Id*. en la pág. 110; *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).
[13] *Oriental Bank v. Perapi*, 192 DPR 7, 26-27 (2014). Énfasis suplido.

Ahora bien, desde la perspectiva del Tribunal de Apelaciones, esta Curia viene obligada a resolver los asuntos planteados ante su consideración de forma fundamentada.[14] En cuanto al estándar revisor del foro apelativo ante este tipo de moción, el Tribunal Supremo ha precisado que *el Tribunal de Apelaciones utilizará los mismos criterios que el TPI al determinar si procede una sentencia sumaria*.[15] En ese sentido, el foro apelativo se encuentra en la misma posición que el TPI al revisar estas solicitudes.[16] Por último, en *Meléndez González v. M. Cuebas*, el Tribunal Supremo recogió diversos aspectos importantes respecto a la revisión del Tribunal de Apelaciones de las mociones de sentencia sumaria; entre estos resaltan los siguientes: (1) su revisión es *de novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la moción, llevando a cabo todas las inferencias permisibles a favor de esta; (2) debe revisar si en realidad existen hechos materiales en controversia y, de haberlos, debe cumplir con exponer concretamente aquellos hechos materiales que encontró que estaban en controversia y aquellos que no; y (3) de encontrar que no están incontrovertidos, debe entonces revisar *de novo* si el TPI aplicó correctamente el derecho a la controversia.[17]

B. **Dodd-Frank Wall Street Reform and Consumer Protection Act**

El Congreso de los Estados Unidos aprobó el "*Dodd-Frank Wall Street Reform and Consumer Protection Act*",

---

[14] *Meléndez González et al. v. M. Cuebas, supra* en la pág. 114.
[15] *Id*. Énfasis suplido.
[16] *Id.* en la pág. 115.
[17] *Id.* en las págs. 118-119. Énfasis suplido.

con la finalidad de promover la estabilidad financiera de los Estados Unidos mediante la fomentación de la responsabilidad y la transparencia del sistema financiero, entre otras cosas.[18] A esos fines, se creó el *Consumer Financial Protection Bureau* (CFPB), la agencia federal encargada de regular todo lo concerniente a la protección de los consumidores en el sector financiero.[19] Como parte de la autoridad general delegada, la CPFB está a cargo de reglamentar, supervisar y hacer cumplir las disposiciones del "*Real Estate Settlement Procedures Act*", conocida como RESPA.

El 10 de enero de 2014, se enmendó la Reglamentación X (*Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act*)[20] para incluir algunas reglas referentes al proceso de mitigación de pérdidas de deudores hipotecarios. Particularmente, la enmienda regula minuciosamente la presentación y evaluación de las solicitudes de mitigación de pérdidas.

En específico, introdujo reglamentación sobre el proceso interno del banco o acreedor hipotecario de mitigación de pérdida del hogar.[21] En apretada síntesis, la reglamentación enmendada dispone que el banco o el acreedor hipotecario no podrán solicitar al Tribunal que ejecute la propiedad para satisfacer la deuda, hasta tanto no cumplan con los postulados del Reglamento.

Para que un banco cumpla con la Reglamentación X debe establecer un procedimiento de mitigación de

---

[18] PL 111-203, 12 USC sec. 5301, *et seq*. La exposición de motivos de la ley versa de la siguiente manera: "An Act to promote the financial stability of the United States by improving accountability and transparency in the financial system, to end "too big to fail", to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes". 12 U.S.C. sec. 5301.
[19] Véase, 12 USC 5491; 12 USC 5514; 12 USC 5515.
[20] Véase, 76 FR 78978; 78 FR 10696; 78 FR 44686; y 78 FR 39902.
[21] 12 CFR 1024.38-1024.41.

pérdida de deuda, que le permita actuar con diligencia razonable, al comunicarse con el deudor para recopilar la información necesaria con el objetivo de completar la solicitud de mitigación en tiempo razonable.[22] Este programa debe incluir políticas y procedimientos que estén razonablemente diseñados, y deben permitir al deudor tener asignado personal al que pueda acudir para orientación e información.[23] Las funciones del personal asignado es servir de contacto, vía comunicación telefónica en vivo, al que pueda recurrir el deudor para obtener respuesta a sus preguntas, y orientación sobre el proceso de mitigación de pérdidas del banco.[24] También es su función brindar información precisa sobre las opciones de mitigación que tiene disponible y proveer cualquier otra información importante, como las circunstancias bajo las cuales el banco desistiría del proceso de mitigación y optaría por el procedimiento de ejecución de hipoteca.[25]

Cónsono con lo anterior, la Reglamentación X requiere que el banco se comunique con el deudor, luego de ocurrido el incumplimiento, para requerirle la información necesaria y así poder completar la solicitud con prontitud. Inclusive, el acreedor hipotecario tiene la obligación de comunicarse con el deudor hipotecario dentro de 36 días después del incumplimiento.[26]

En ese primer comunicado, el banco debe orientar al deudor sobre el programa de mitigación de deudas que ofrece.[27] Asimismo, dentro de los 45 días siguientes al

---

[22] 12 CFR 2410.38.
[23] 12 CFR 1024.38(a).
[24] 12 CFR 1024.40(b)(1).
[25] *Id*.
[26] 12 CFR 1024.39(a).
[27] *Id*.

incumplimiento, el banco debe proveer todas las opciones de mitigación de pérdida para las que cualifique el deudor y brindarle al deudor una persona contacto para su caso.[28] Como adelantamos, esta persona deberá estar disponible para contestar cualquier pregunta del deudor, y para brindarle información adicional en referencia al proceso de mitigación de pérdida interno del banco.

El Reglamento establece, como requisito, que en la notificación se incluya una fecha razonable en la que el deudor debe someter los documentos e información necesaria para completar la solicitud de mitigación de pérdidas.[29] Como protección adicional al deudor, el Reglamento establece que si la venta de la propiedad en pública subasta no ha sido pautada, se entiende que la solicitud ha sido recibida con antelación a los 90 días previos a la venta de la propiedad en pública subasta.[30]

Para que un banco o acreedor hipotecario pueda evaluar una solicitud de mitigación de pérdidas, esta deberá estar completa.[31] La reglamentación dispone que cuando un deudor presenta una solicitud de mitigación de pérdidas el acreedor hipotecario deberá notificarle al deudor, dentro de un período de cinco días, que recibió dicha solicitud y si la misma está completa o incompleta.[32] La regla dispone que en aquellos casos en los que se le notifique una falta de documentos necesarios para evaluar la solicitud, si el deudor

---

[28] 12 CFR 1024.39(b).
[29] 12 CFR 1024.41(b)(2)(ii).
[30] 12 CFR 1024.41(b)(3); 78 FR 10696-01.
[31] 12 CFR 1024.41(b)(1). La Reglamentación X define a la *solicitud completa* como: "[…]an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application".
[32] 12 CFR 1024.41(b)(2)(i)(B).

somete todos los documentos solicitados, la solicitud se considerará "*facially complete*".[33] Si el acreedor hipotecario descubre que necesita información adicional o corregir documentos previamente sometidos para completar la solicitud, el acreedor debe requerirle al deudor la información faltante o los documentos con las correcciones pertinentes.[34] El banco debe, además, tratar la solicitud como si estuviese completada hasta tanto el deudor se le haya brindado una oportunidad razonable para completar la solicitud.[35] En aquellos casos donde el *acreedor hipotecario deniegue una solicitud de modificación del préstamo, la denegatoria debe contener las razones específicas que motivaron el rechazo*[36] y permitirle al deudor apelar la decisión ante los ejecutivos del banco.

Sobre el proceso de apelación, la Reglamentación X dispone que en aquellos casos en que el acreedor hipotecario recibe una solicitud completa, 90 días o más con anterioridad a la ejecución, entonces el deudor puede apelar la denegatoria a cualquier opción de mitigación de pérdida o a una opción bajo probatoria.[37] La apelación debe ser presentada dentro de los 14 días a partir de la fecha de la denegatoria.[38] El acreedor hipotecario tiene la obligación de evaluar la apelación con funcionarios independientes a los que formularon la denegatoria.[39] El acreedor tiene un plazo de 30 días desde la presentación de la apelación para notificar su decisión, indicando si le ofrecerá al deudor una opción

---

[33] 12 CFR 1024.41(c)(2)(iv).
[34] *Id.*
[35] *Id.*
[36] 12 CFR 1024.41(d); 12 CFR 1024.41(e). Énfasis suplido.
[37] 12 CFR 1024.41(h)(1).
[38] 12 CFR 1024.41(h)(2).
[39] 12 CFR 1024.41(h)(3).

de mitigación de perdidas basada en la apelación.[40] También deberá detallar cuanto tiempo el deudor para aceptar o rechazar la oferta del acreedor sobre mitigación de pérdidas.[41] Un banco o acreedor hipotecario le puede requerir al deudor que acepte o rechace la oferta, no antes de 14 días después de que el acreedor notifique su determinación.[42] Es importante resaltar que esta determinación no está sujeta a ninguna apelación adicional.[43]

Por otro lado, la Reglamentación X prohíbe a los bancos mantener acciones paralelas o simultáneas (*dual tracking*) contra los deudores.[44] Se entiende que el *dual tracking* ocurre cuando el banco inicia, presenta, continúa o promueve una acción conducente a la ejecución de la hipoteca, mientras considera una solicitud de mitigación de pérdida del hogar.[45] Esta prohibición tiene dos dimensiones. La primera se configura cuando se inicia una acción de ejecución de hipoteca mientras se está evaluando una solicitud de mitigación de pérdidas. La segunda se configura cando se continua una acción de ejecución de hipoteca al tiempo de estar evaluando un requerimiento de este tipo. Bajo el primer escenario, la norma dispone que una entidad bancaria **no puede emplazar al deudor notificándole de una demanda en su contra hasta que emita la decisión final sobre la solicitud**; es decir, que la determinación no esté sujeta a apelación.[46]

El segundo escenario prohibido bajo la norma de *dual tracking* se da cuanto la solicitud de mitigación de

---

[40] 12 CFR 1024.41(h)(4).
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] 12 CFR 1024.41(f).
[45] *Id.*
[46] *Id.*

pérdidas se presenta después de haber comenzado una reclamación. En particular, la referida Reglamentación establece lo siguiente:

> (a) *Prohibition on foreclosure sale.* **If a borrower submits a complete loss mitigation application** after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, **a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:**
>
> 1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
> 2) The borrower rejects all loss mitigation options offered by the servicer; or
> 3) The borrower fails to perform under an agreement on a loss mitigation option.[47]

Como corolario de lo anterior, el banco o acreedor hipotecario **está vedado de solicitar la ejecución de la sentencia o realizar una subasta para la venta del inmueble** si, luego de haberse iniciado una acción de ejecución de hipoteca, el deudor somete una solicitud de mitigación de pérdidas válida. Esto es, siempre y cuando no se configure alguna de las situaciones antes reseñadas. Entiéndase, que el deudor: 1) no es elegible para el proceso de mitigación de pérdidas, 2) rechaza las opciones de mitigación de pérdidas, o 3) incumple

---

[47] 12 CFR sec. 1024.41(g)(1)(2)(3). Énfasis suplido.

con los acuerdos alcanzados en el proceso de mitigación de pérdidas.

Es importante resaltar que el acreedor hipotecario no está obligado a proveer una opción de mitigación específica.[48] Sin embargo, de denegar la solicitud, el banco deberá notificar al deudor por escrito las razones específicas por las cuales denegó su solicitud.[49] Por otro lado, la Reglamentación X permite ofrecer una opción de mitigación de pérdida -*sin que la solicitud esté completa*- cuando el ofrecimiento no está basado en evaluación alguna de la información sometida en relación con la solicitud.[50] De igual forma, exige a la institución financiera brindar una oportunidad razonable para completar la solicitud.[51] De manera que, es requisito notificar al deudor sobre cuál es la información adicional o documento corregido que se requiere, además de brindarle suficiente tiempo para recopilar la información o la documentación necesaria para completar la solicitud.[52] La cantidad de tiempo que se estima razonable dependerá de los hechos y las circunstancias de cada caso.[53] A estos efectos, el Reglamento X dispone expresamente:

> That the servicer may need additional information at a later date to evaluate the application, in which case the servicer will request that information from the borrower and give the borrower a reasonable opportunity to submit it, the evaluation process may take longer, and the foreclosure protections could end if the servicer does not receive the information as requested.[54]

---

[48] 12 CFR 1024.41(a).
[49] 12 CFR 1024.41(d).
[50] 12 CFR 1024.41(c)(2)(i).
[51] 12 CFR 1024.41(c)(2)(iv).
[52] *Id*.
[53] *Id*.
[54] 12 CFR 1024.41(c)(3)(e).

El Reglamento X obliga a la entidad encargada de manejar los trámites administrativos relativos al préstamo, a tener políticas y procedimientos razonablemente diseñados para poder cumplir con varios objetivos. Entre ellos, proveer información precisa y oportuna a los deudores, según éstos la soliciten o lo requiera la ley y reglamentos aplicables.[55] Esas políticas y procedimientos también deben estar diseñadas para asegurar que el acreedor o agente hipotecario pueda evaluar apropiadamente las solicitudes de mitigación de pérdidas conforme a lo siguiente:

(i) Provide accurate information regarding loss mitigation options available to a borrower from the owner to assignee of the borrower's mortgage loan;

(ii) Identify with specificity all loss mitigation options for which borrowers may be eligible pursuant to any requirements established by an owner or assignee of the borrower's mortgage loan;

(iii) Provide prompt access to all documents and information submitted by a borrower in connection with a loss mitigation option to servicer personnel that are assigned to assist the borrower pursuant to sec. 1024.40;

(iv) Identify documents and information that a borrow is required to submit to complete a loss mitigation application and facilitate compliance with the notice required to § 1024.41(b)(2)(i)(B); and

(v) Properly evaluate a borrower who submits and application for a loss mitigation option for all loss mitigation options for which the borrower may be eligible pursuant to any requirements established by the owner or assignee of the borrower's mortgage loan and, where applicable, in accordance with the requirements of sec. 10.24.41.[56]

De otro lado, El Reglamento X prohíbe comenzar o continuar cualquier proceso judicial de ejecución de

---

[55] 12 CFR 1024.38(a); 12 CFR 1024.38(b)(1).
[56] 12 CFR 1024.38(b)(2).

hipotecas.[57] Particularmente, el reglamento dispone que *no se pueden comenzar procesos de ejecución, salvo que, el agente hipotecario notifique al deudor que ya no es elegible para ninguna de las alternativas de mitigación de pérdidas y no tiene derecho a ejercer ningún tipo de apelación*.[58] El reglamento expresamente dispone:

2) **If a borrower submits a complete loss mitigation application during the pre-foreclosure review period** set forth in paragraph (f)(1) of this section or before a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, **a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:**

i) **The servicer has sent the borrower a notice** pursuant to paragraph (c)(1)(ii) of this section **that the borrower is not eligible for any loss mitigation option and the appeal process** in paragraph (h) of this section **is not applicable, the borrower has not requested an appeal within the applicable time period for requesting appeal, or the borrower's appeal has been denied.**

ii) The borrower rejects all loss mitigation options offered by the servicer; or

iii) The borrower fails to perform under an agreement on a loss mitigation option.[59]

## C. Truth in Lending Act

Tras varios años de estudio y debate en el Congreso de los Estados Unidos respecto a la utilidad y necesidad de imponer la obligación a aquellos que regularmente extienden crédito, de revelar de manera uniforme al consumidor el costo real de la transacción que están llevando a cabo para que puedan comparar entre distintas

---

[57] 12 CFR 1024.41(f).
[58] 12 CFR 1024.41(f)(2). Énfasis suplido.
[59] *Id.*

alternativas de crédito, en el año 1968 fue aprobada la Ley federal conocida como el *Truth in Lending Act* (TILA).[60]

El objetivo primordial de la referida ley es evitar prácticas fraudulentas. Antes de que el Congreso aprobara TILA, *supra*, los consumidores no tenían forma de conocer realmente el costo del crédito obtenido y tampoco podían comparar los ofrecimientos y facilidades de crédito entre varias entidades crediticias.[61] Ello se debía al hecho de que los acreedores no utilizaban una forma uniforme de calcular el interés ni tampoco detallaban los cargos adicionales, los cuales no se reflejaban en la tasa de interés.[62]

A tenor con el objetivo perseguido, TILA establece lo siguiente:

> (b) Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Bureau, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with

---

[60] 15 USC 1601 *et seq.*; Asoc. de Empleados del ELA v. Vázquez Pérez, 130 DPR 407, 416 (1992).

[61] *Asoc. de Empleados del ELA v. Vázquez Pérez*, supra a las págs. 417-418.

[62] *Id.* a la pág. 418.

regulations of the Bureau, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

(c) When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

(d) […]
(e) […]
(f) […]

(g) An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor, […].[63]

## -III-

A tenor con la normativa expuesta, procedemos a evaluar los méritos del recurso ante nuestra

---

[63] 15 USC 1635.

consideración. En su recurso, los apelantes nos solicitan la revocación del dictamen del TPI en el que declaró *Ha Lugar* la *Moción de Sentencia Sumaria Parcial Desestimando Reconvención*, acogiendo los planteamientos del BPPR y desestimando la reconvención presentada por los apelantes.

Por mandato reglamentario y jurisprudencial, revisamos *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la determinación, entiéndase, los apelantes. De este modo, cotejamos si existen hechos materiales en controversia y si el TPI aplico correctamente el derecho a la controversia. Luego de nuestra revisión, nos encontramos en posición de revocar la determinación del TPI.

El foro primario determinó que BPPR no había incurrido en *dual tracking* al presentar una demanda sobre ejecución de hipoteca y cobro de dinero contra los apelantes. Concluyó que, al momento de presentarse la demanda, no existía una solicitud de mitigación de pérdida activa ni completa. Somos del criterio que el TPI erró al así concluir.

En su Alegato, BPPR arguye que el 15 de abril de 2015 les informó a los apelantes que su expediente estaba completado y que procedería a trabajar una posible modificación, sujeto a la aprobación del inversionista. El 1 de octubre de 2015, los apelantes recibieron un mensaje del señor Shenielle Hernández que "**[l]os documentos del expediente están vencidos por lo que se deben actualizar ingresos y gastos para firmar el mismo. El expediente actual se debe inactivar por lo que**

*recibirán una carta dejando saber que fue inactivo el expediente*".[64]

Nótese, que el comunicado indica que se inactivó el expediente, no que se denegó la solicitud. Y es que, como surge del comunicado y del propio Alegato de BPPR, el expediente se completó el 15 de abril de 2015. Sin embargo, no es hasta el 1 de octubre de 2015 que BPPR les notificó a los apelantes que los documentos estaban expirados.

Evidentemente, el BPPR tenía ante sí un expediente completo y listo para ser evaluado a la mayor brevedad posible. Según se mencionó anteriormente, la Reglamentación X hace hincapié en que las evaluaciones de las solicitudes de mitigación de pérdidas se hagan con prontitud. Como bien señalaron los apelantes en su recurso, seis meses después de habérseles notificado que su expediente estaba completo, BPPR les notificó que el expediente sería inactivado. No *denegado*, sino *inactivado*. Los apelantes, según lo dispuesto por BPPR en sus misivas, tendrían la oportunidad de presentar documentación actualizada para su eventual evaluación.

De manera que, BPPR no denegó la solicitud de los apelantes. Meramente pausó los procedimientos hasta tanto los apelantes entregaran la documentación actualizada. Dicho de otro modo, el proceso de mitigación de pérdidas seguía en curso al momento de presentarse la causa demanda sobre ejecución de hipoteca y cobro de dinero.

Tanto es así que el 30 de marzo de 2016, fecha posterior a la presentación de la demanda, la Unidad de

---

[64] Apéndice del Recurso, página 50.

Mitigación de Pérdidas remitió un comunicado indicándole a los apelantes que:

> [l]uego de una evaluación de la información provista por usted, se le ha aprobado comenzar un periodo de prueba. **Este es el primer paso para cualificar para una modificación de su préstamo o un reclamo parcial**, por tal razón es importante que usted lea completamente eta información para que conozca los pasos que usted debe seguir para completar exitosamente este periodo de prueba.
>
> [S]i ya su préstamo hipotecario fue referido a cobros mediante vía judicial, se detendrá el proceso legal. No obstante, de usted no aceptar esta oferta y/o no cumplir con el primer pago de este periodo de prueba para la fecha antes mencionada, **iniciaría o continuaría el proceso legal**.[65]

Del comunicado surge que la solicitud de mitigación de pérdidas se encontraba en el primer paso para modificar el préstamo hipotecario. Entiéndase, la solicitud de los apelantes seguía en curso aún después de haberse presentado la demanda. Ciertamente, esto resulta ser un hecho en controversia que denota la comisión de *dual tracking* por parte de BPPR.

Así las cosas, solo podemos llegar a la ineludible conclusión de que el TPI erró al desestimar la reconvención de los apelantes.

**-IV**

Por los fundamentos expuestos, se *revoca* la Sentencia Sumaria Parcial apelada y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[65] Apéndice del Apelado páginas 46-47. Énfasis suplido.